

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JAN 1 1 2005

CLERK. U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| ANNA SALINAS, on her behalf and on behalf of those similarly situated, | § § § | |
| Plaintiff, | § § | Civil Action No. 3:04-CV-1861-B |
| v. | § § | |
| O'REILLY AUTOMOTIVE, INC., | § § | |
| Defendant. | § § | |

## O'REILLY'S BRIEF OPPOSING PLAINTIFF'S MOTION TO COMPEL

BAKER BOTTS, L.L.P.

Teresa S. Valderrama
State Bar No. 20422500
Kathryn S. Vaughn
State Bar No. 00785144
One Shell Plaza
910 Louisiana
Houston, Texas  77002
Telephone:  (713) 229-1234
Facsimile:  (713) 229-1522

OF COUNSEL:
Eric Senske
State Bar No. 18027100
BAKER BOTTS, L.L.P.
2001 Ross Avenue
Dallas, TX 75201
(214) 753.6500 (Telephone)
(214) 753.6503 (Fax)

John M. Williams
State Bar No. 21554200
L. Don Luttrell
State Bar No. 12708630
LUTTRELL AND WILLIAMS, P.C.
3000 Weslayan, Suite 350
Houston, Texas  77027
Telephone:  (713) 877-1077
Facsimile:  (713) 877-1089

ATTORNEYS FOR DEFENDANT
O'REILLY AUTOMOTIVE, INC.

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................... 1

   A.   Plaintiff's Broad Allegations and Sparse Support ........................................ 1

   B.   Plaintiff's Actual Claims ............................................................................... 2

   C.   O'Reilly's Investigation ................................................................................ 7

   D.   Plaintiff's Efforts to Obtain O'Reilly's Work Product Outside Discovery ............. 7

   E.   Plaintiff's Efforts to Discover O'Reilly's Attorneys' Work Product Through Discovery .................................................................................................... 8

   F.   O'Reilly Deposes Plaintiff and Finally Learns the Basis for Her Claims ............ 9

   G.   Plaintiff's Motion to Compel ...................................................................... 10

   H.   O'Reilly's Privilege Log .............................................................................. 11

II.   SUMMARY ........................................................................................................ 12

III.  ARGUMENT AND AUTHORITIES ..................................................................... 13

   A.   O'Reilly has fully complied with the Federal Rules of Civil Procedure in asserting that the investigative materials at issue are protected by the work product doctrine. ......... 13

IV.   CONCLUSION ................................................................................................... 16

# TABLE OF AUTHORITIES

## CASES

*Estavez v. Matos,*
    125 F.R.D. 28 (S.D.N.Y. 1989) ............................................................14

*Ferko v. Nat'l Ass'n for Stock Car Auto Racing, Inc.,*
    219 F.R.D. 396 (E.D. Tex. 2003) ........................................................13

*Hickman v. Taylor,*
    329 U.S. 495 (1947) ............................................................................14

*Smith v. Diamond Offshore Drilling, Inc.,*
    168 F.R.D. 582 (S.D. Tex. 1996) ........................................................13

*Smith v. WNA Carthage, L.L.C.,*
    200 F.R.D. 576 (E.D. Tex. 2001) ........................................................13

## STATUTES

Fed. R. Civ. P. 26(b)(3) ..................................................................12, 13, 14

Fed. R. Civ. P. 26 advisory committee note .........................1, 8, 11, 13, 14, 15

Federal Rule of Civil Procedure 26(b)(5) ......................................................12

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ANNA SALINAS, on her behalf and on behalf of those similarly situated, | § § § | |
| Plaintiff, | § § | Civil Action No. 3:04-CV-1861-B |
| v. | § § | |
| O'REILLY AUTOMOTIVE, INC., | § § | |
| Defendant. | § § | |

## O'REILLY'S BRIEF OPPOSING PLAINTIFF'S MOTION TO COMPEL

Defendant O'Reilly Automotive, Inc. ("O'Reilly") opposes Plaintiff Anna Salinas' Motion to Compel the production of the investigative work product of its attorneys. Rule 26 permits the discovery of work product only if it is "otherwise discoverable" and, even then, only if the discovering party meets the high burden of showing "substantial need" for the materials and "undue hardship" in obtaining the "equivalent." Plaintiff's Motion to Compel does not even discuss, let alone meet, these stringent requirements.

### I. INTRODUCTION

*A.    Plaintiff's Broad Allegations and Sparse Support*

On August 26, 2004, Plaintiff Anna Salinas, a former O'Reilly employee, filed her Original Collective Action Complaint ("Complaint") alleging that she and "similarly situated" O'Reilly employees were required to work "off the clock" in violation of the Fair Labor Standards Act ("FLSA"). (Complaint ¶ 3.) Although it turns out that Salinas' actual complaint, per her deposition testimony, is a purely local dispute with one of her former store managers, Plaintiff's counsel nonetheless issued nationally-circulated press releases on the date her lawsuit was filed, touting it as a nationwide collective action affecting 1,183 stores in 18

states and soliciting witnesses and additional plaintiffs. (App. 026-031.) Plaintiff's pleadings allege that the putative collective action participants "are those employees who are similarly situated to Plaintiff in that their relevant job duties and pay provisions were similar to Plaintiff." (Complaint ¶ 3.) Apart from this bare-bones statement, the Complaint provides no factual support for or explanation of the basis for a collective action. (Complaint ¶ 3.)

On September 27, 2004, Plaintiff voluntarily served initial disclosures. These disclosures are remarkable only for the lack of any factual content. For example, they identify only the Plaintiff, one "opt-in," and the CEO of O'Reilly as persons with knowledge of relevant facts, notwithstanding the broad allegation of a collective action and of others "similarly-situated." The required damages statement merely defers, providing no indication of the claim valuation or how it is calculated. No documents supporting either the Plaintiff's claims or a collective action are identified.[1] (App. 032-036.) Nor did Plaintiff respond to letters requesting an explanation of the facts underlying Plaintiff's collective action claims, which O'Reilly needed to prepare its own initial disclosures. (App. 117.)

**B.    Plaintiff's Actual Claims**

Contrary to the sweeping reach of her Complaint and her press releases, Plaintiff really is suing over isolated, local grievances between herself and her local O'Reilly store manager at the time, Ronnie Everage ("Everage"), all occurring at Store 771.

---

[1] Subsequent disclosures by Plaintiff on November 16, 2004 and November 8, 2004, (App. 037-042), adopted information provided by O'Reilly's own disclosures, identified scattered persons who filed consents (as might be anticipated, in response to Plaintiff's advertisements about her "nationwide" lawsuit), listed some former co-workers from one O'Reilly store at which Plaintiff worked, identified local management as persons to whom Plaintiff had complained, and summarily stated a damages claim down to the penny with no explanation of the methodology behind it. At deposition, Plaintiff testified she doesn't know what her damages are or how the very precise amount of $14,525.36 is calculated. (App. 020-021 (Dep. at 137-38).) Subsequent correspondence from Plaintiff's counsel still does not disclose how the precisely-stated damages amount of $14,525.36 was calculated. (App. 108-116.) Most importantly, none of this "disclosure" information set out any factual basis for Plaintiff's purported collective action claims.

Since Plaintiff first went to work for O'Reilly on December 20, 1999, (App. 002 (Dep. at 9)), until she quit on May 7, 2004 (App. 008 (Dep. at 35)), Plaintiff worked at five O'Reilly store locations: Fort Worth (twice), Burleson, Mansfield (twice), Duncanville and Midlothian.  (App. 002-05 (Dep. at 9-20).)  Thus she had substantial experience with O'Reilly across these five store locations.  Plaintiff was paid for all regular (non-overtime) hours she worked at every store location except for eight hours she asserts were shorted from her last paycheck at Store 771.[2]

Significantly, Plaintiff was paid for all overtime hours she worked except at one O'Reilly store -- Store 771 in Mansfield.[3]  Even at the Mansfield store, Plaintiff testified that store manager Everage was the *only* store manager, of all those whom she had at the store, who

---

[2] **Q.**    Okay.  Other than this eight hours of regular time that you are saying you didn't receive on your last paycheck that doesn't appear in your lawsuit, is there any other period or periods of time that you worked for O'Reilly that you are claiming you did not receive every hour of your regular pay?

    **A.**    I got every hour.

**Q.**    So today we are only dealing with, in your allegation, eight hours of regular time you say you weren't paid and then whatever overtime we are going to discuss you claim you weren't paid?  Am I correct?

    **A.**    Yes, sir.

(App. 007 (Dep. at 32-33) (objection omitted).)

[3] **Q.**    All right.  In fact, it is my understanding in this case -- and correct me if I am wrong --

    **A.**    Yes, sir.

**Q.**    -- this claim you are making where you are saying you are owed overtime hours that you were not paid, *you are claiming all of that occurred at store 771, the Mansfield store.  Am I right on that?*

    **A.**    *Yes, sir.*

(App. 009 (Dep. at 40) (Emphasis added.).)

did not pay her, and others, for overtime hours.[4]  In fact, while at Store 771, before Ronnie Everage became her store manager, Plaintiff recalled other "good" store managers who paid her overtime properly.[5]  Similarly, outside of Store 771, Plaintiff was properly paid overtime by store managers other than Ronnie Everage.[6]

---

[4] **Q.**    Ms. Salinas, if I have heard you correctly today -- and I think I have but correct me if I misspeak, but it appears to me that the gist of what you are claiming here today as to overtime which you say that you worked and were not paid, you're -- you're claiming that it goes back to issues with Ronnie Everage in causing you not to get paid that overtime.  Is that what I have heard from you today?

      **A.**    Yes, sir.

**Q.**    Okay.  And the same thing for these other people that you have claimed that may or may not have overtime issues, it appears that you are also claiming their issues are tied to the manager, Ronnie Everage?

      **A.**    Yes, sir.

**Q.**    I haven't heard you say it is someone else's fault other than issues they had with him. Am I correct on that?

      **A.**    Yes, sir.

(App. 024 (Dep. at 200-01) (objection omitted).)

[5] **Q.**    Okay.  Did you ever work any overtime under Mr. Beale?

      **A.**    I might have, and if I did I'm sure he paid it.

**Q.**    Okay.  So as long as Mr. Beale was manager you are not claiming in this lawsuit you are owed for any overtime during any period of time Mr. Beale was there?

      **A.**    Oh, no, sir.

**Q.**    Okay.

      **A.**    ***He was a good manager.***

(App. 011 (Dep. at 86) (emphasis added); *see also* App. 011 (Dep. at 87).)

[6] **Q.**    Okay.  All right.  And had you gotten along well [with] Mr. Carter when he was your manager?

      **A.**    Yes, sir.  ***He was one of the best managers O'Reilly ever had.***

(App. 006 (Dep. at 26) (emphasis added).)

**Q.**    So is it your testimony here today that the entire time you worked with O'Reilly you never had a check that had overtime on it?

      **A.**    No, sir.  When I first started out with O'Reilly's I got hired in by Dan Dowell.

**Q.**    Yes, ma'am.

      **A.**    I think I started out at $8, 8.50.  I'm not sure.  Dan Dowell promised my [sic] five hours overtime a week for me driving so far.  That was fine.  I did it, did it, and did it for a while, and then all of a sudden it slacked off.  That was fine.

In sum, Plaintiff's testimony establishes that her overtime pay dispute is personal; it does not out of some systemic problem with O'Reilly's overtime pay policies and practices. At four out of the five stores where Plaintiff worked, she admits she had no problem whatsoever. And within the one store where Plaintiff contends her problem with overtime pay arose, the alleged problem related to only a single manager, Ronnie Everage. The others were, for the most part, "good" managers and Plaintiff ordinarily was paid all she was due while working for them -- even at the Mansfield store. *See* fn. 2-6. Additionally, on at least one occasion, under store manager Lowrey, when Plaintiff objected that she had not been paid for eight hours of overtime she had worked, the district manager fixed the problem immediately. (App. 012, 017 (Dep. 94-95; 117).)

Finally, even as to the complaints Plaintiff did have while an O'Reilly team member -- *i.e.*, at Store 771 while managed by Ronnie Everage -- the specific overtime pay claims that Plaintiff asserts were unique to her personally, inapplicable even to other team

---

When they could they would give me overtime, but that was under that store over there. ***That was good. It was all correct.*** I didn't have any problems with it.

(App. 009 (Dep. at 39) (emphasis added).)

**Q.**    So you are saying when you were at the Fort Worth store the two different times you worked there -- that is what you are talking about, right?

**A.**    Yes, sir.

**Q.**    You are saying all during that time period your checks were always correct? Is that what you are saying?

**A.**    Yes, sir. ***They were good managers. Whenever we signed for our checks they would ask us to look at our hours that was brought in, and if we had any questions we would ask the manager. It was taken care of.***

**Q.**    You always got all your overtime, is what you are saying?

**A.**    Uh-huh.

**Q.**    You always got paid for it?

**A.**    Yes, sir.

(App. 009 (Dep. at 40) (emphasis added).)

members who worked at Store 771 under Everage.

Plaintiff testified about four separate circumstances giving rise to her overtime pay claims against Ronnie Everage while working at the Mansfield store. They are as follows:

- On six occasions between January 2004 and April 2004, Plaintiff and another employee, Jacob Clay, were required to stay late to handle "tape backup" responsibilities, and Plaintiff alleges neither she nor Clay were paid overtime for this. (App. 010, 020 (Dep. at 74-75; 135-36).)

- Once, when Everage was on vacation with his wife in June or July of 2003, Plaintiff and another employee named Mike were instructed to report to work two hours early on a Saturday, and Plaintiff believes she and Mike were not paid for those two hours. (App. 017, 020 (Dep. at 115-16; 136).)

- On twenty or so occasions, Plaintiff came to work a half an hour before her scheduled start time and Everage would give her work to do in the store before her official start time. When she refused to do this unless he paid her for it, Everage told her she should leave and come back later, but not to be late for her shift. Plaintiff did not write her overtime on the schedule on these twenty occasions because Everage deliberately put the schedule where it was too high for her, a small person, to reach without climbing on a desk, which she didn't want to do. (App. 018-19 (Dep. at 126-28; 131-33).)

- From April 2003 until Plaintiff quit on May 7, 2004, Plaintiff allegedly was singled out[7] to work through lunch nearly every day without being paid overtime. (App. 016, 020 (Dep. at 112; 135-36).)

Each of these is a unique circumstance that applies solely to Plaintiff. None gives rise to a systemic violation of the FLSA that warrants or might support a collective action, or discovery about a collective action.

---

[7] Q.    Okay. So you are saying you were singled out by your manager not to be allowed to go to lunch on a daily basis. That is what you are saying?

A.    Yes, sir.

Q.    Where other people in the store were not singled out?

A.    Yes, sir.

Q.    Is there any reason why you're alleging that to be the case?

A.    I don't know what he had against me.

(App. 016 (Dep. at 111-12) (objections omitted); *see also id.* at 111.)

## C.    *O'Reilly's Investigation*

Of course, at the time the lawsuit was filed, O'Reilly did not have the benefit of Plaintiff's deposition testimony, which now has revealed the gaping discrepancy between her pleaded claims and her sworn testimony.    Lacking information to substantiate Plaintiff's individual or collective action allegations, and affronted by Plaintiff's trumpeting of national advertisements soliciting lawsuit participants, O'Reilly initiated an internal investigation through its lawyers to gather information to aid in defending the case filed by this Plaintiff.  Beginning September 20, 2004 and through December 7, 2004, O'Reilly's attorneys obtained recorded interviews of witnesses whom its attorneys selected for the purpose of investigating and defending against Plaintiff's claims.

O'Reilly has never hidden the fact of, or the need for, its investigation:   In its earliest letters to Plaintiff's counsel (seeking information about Plaintiff's claims in connection with the Court's November 1, 2004 disclosure deadline) and even in its disclosures themselves, O'Reilly specifically noted that -- notwithstanding an extensive investigation -- it was not able to determine the information that might be called for through initial disclosures because the lack of any disclosed factual basis for Plaintiff's claims made a reasoned analysis or the exercise of judgment as to the basis for Plaintiff's claims impossible. (App. 117, 052-053.)

## D.    *Plaintiff's Efforts to Obtain O'Reilly's Work Product Outside Discovery*

By November 8, 2004, Plaintiff's attorneys had learned for their sources that O'Reilly's investigation included its attorneys' recorded interviews of witnesses.    Plaintiff demanded the production of these witness interviews, (App. 051), even though they are not required as initial disclosures nor by any discovery responses that then was due to Plaintiff.[8]

---

[8]    There is much irony, at many levels, with Plaintiff's focus on O'Reilly's attorney's disclosure of their defensive work product.  Under Rule 11, it is Plaintiff's attorneys' obligation to have investigated the basis for

Plaintiff's first demand for a "privilege log" was in connection with O'Reilly's initial disclosures. Plaintiff has not cited and O'Reilly has not found any authority that requires the compilation of a privilege log as part of initial disclosures, particularly where, as here, O'Reilly lacked any information about Plaintiff's basic factual allegations and had not then determined whether its interviews were on point or off base, let alone whether it might use such documents in support of its defenses under Rule 26. The scope of Plaintiff's actual claims was unknown. (App. 052-054.)

Moreover, O'Reilly already had informed Plaintiff's counsel that, without meaningful disclosure by Plaintiff of the factual basis for her personal or collective action claims, O'Reilly was in no position to exercise judgment as to whether any particular aspect of O'Reilly's investigation was relevant to, let alone might be used, in support of O'Reilly's claims or defenses. (App. 117.)

**E.     *Plaintiff's Efforts to Discover O'Reilly's Attorneys' Work Product Through Discovery***

On November 8, 2004, Plaintiff served an interrogatory and three requests for production designed solely to discover O'Reilly's work product. That November 8, 2004 discovery also appears to be the basis for this Motion to Compel, and is excerpted below:

---

Plaintiff's collective action complaints, and to have a good faith basis for asserting the collective action claim. However, Plaintiff's testimony flatly defeats any collective action practice or policy, as she herself describes having been singled out by a single supervisor in a single store during only a part of his tenure as her boss. Plaintiff knew nothing about the claims of alleged "opt-in" Pat Gruesbeck, the *only* other witness identified in Plaintiff's first initial disclosures (served more than 30 days *after* the collective action allegations were made and, certainly, after Plaintiff already should have engaged in a Rule 11 analysis of whether a collective action could properly be asserted by this Plaintiff, Anna Salinas). Gruesbeck, apparently, responded to Plaintiff's lawyers' national advertisements. If Plaintiff's attorney's have any basis at all for a collective action, that basis must have arisen out of interviews with Gruesbeck (or undisclosed others), and it would not at all be a stretch to surmise that Plaintiff's attorneys recorded their interview with Gruesbeck, or others, in some form, such as notes. Yet, while seeking to compel the production of recorded interviews taken by O'Reilly's defense attorneys, Plaintiff provides no privilege log disclosing any documents memorializing interviews by her own lawyers. The line that Plaintiff seeks to cross in compelling work product of opposing counsel has not been lightly drawn, should not be easily crossed, and, once crossed, creates a myriad of discovery issues.

**INTERROGATORY 1:**

For each witness statement *that you have gathered for the defense of the claims asserted in this case*, identify each witness interviewed, when the interview was conducted, the identities of the individuals involved in the interview, and the manner in which that interview was recorded.

**REQUEST FOR PRODUCTION NO. 1:**

Produce a copy of the recording (videotape, audiotape or stenographic) of each witness statement *collected in connection with the defense of the claims asserted in this case*.

**REQUEST FOR PRODUCTION NO. 2:**

Produce a copy of all store surveillance videotapes *that you have collected in connection with the defense of the claims asserted in this case*.

**REQUEST FOR PRODUCTION NO. 3:**

Produce copies of all store documents *that you have collected in connection with your defense of the claims asserted in this case* from the stores of where the plaintiffs were employed.

(App. 063-064 (emphasis added).)  The discovery Plaintiff seeks is tied to, and is intended to be tied to, the thought processes of O'Reilly's counsel and its defense of this suit.   In complete disregard of the Plaintiff's actual testimony, Plaintiff tailors her discovery to obtain the documents collected, witnesses identified, and questions asked by O'Reilly's lawyers in response to Plaintiff's broad collective action allegations and press releases--not to her actual claims.  This is untenable.

**F.        *O'Reilly Deposes Plaintiff and Finally Learns the Basis for Her Claims***

After much strife,[9] Plaintiff finally agreed to be deposed on December 9, 2004.  However, O'Reilly's response to Plaintiff's discovery was due December 8, 2004.  Moreover, O'Reilly did not get the transcript of Plaintiff's deposition until late on December 15, 2004, and that transcript defines the Plaintiff's claims.  *See* Part I.B., *supra*.  Obtaining Plaintiff's

---

[9] O'Reilly is not attaching extensive correspondence between counsel over the efforts to obtain Plaintiff's deposition.

deposition transcript was a watershed event:  It allowed O'Reilly, for the first time, to determine and document the specific parameters of Plaintiff's actual claims -- as opposed to speculating about the broad sweep of her "off the clock" collective action allegations and the national press releases she had issued.  As detailed at Part I.B., *supra,* Plaintiff's claims are singular and personal, repudiating by their own substance any basis for a collective action.

Plaintiff's counsel met with O'Reilly's counsel on December 15, 2004.  At that time, O'Reilly's counsel committed to providing a privilege log once Plaintiff's transcript became available from the court reporter and the relevancy of the work product could be considered in light of Plaintiff's testimony.  O'Reilly's commitment was affirmed in writing to Plaintiff's counsel that same afternoon.  (App. 055.)

## G.    *Plaintiff's Motion to Compel*

On December 21, 2004, less than a week after receiving O'Reilly's oral and written commitment to provide a privilege log once the transcript of the Plaintiff's deposition could be reviewed (App. 055), Plaintiff filed the Motion to Compel at issue here.

In support of her motion, Plaintiff alleges that O'Reilly has **"repeated[ly]"** failed to produce a privilege log under "the clear mandate of the Federal Rules of Civil Procedure," and complains that this transgression, "dating back at least to November 15, 2004," is evidence of O'Reilly's **"repeated"** violation of a "clear mandate."  (Plaintiff's Brief at 3 (emphasis in original).)  However, Plaintiff not only fails to identify the source of the "clear mandate," but fails also to acknowledge that O'Reilly had no responsibility whatsoever to even respond to Plaintiff's demand for a privilege log until the discovery responses became due *many* weeks later, on December 8, 2004.  Nor does Plaintiff acknowledge that even on December 8, 2004, Plaintiff had not yet provided "bare bones" factual basis for her personal or collective action claims, preventing O'Reilly from exercising reasonable judgment as to what might be relevant

and should be included, and what should be excluded, from any privilege log. Thus, Plaintiff's recital to the Court of O'Reilly's "repeated" improper conduct in violation of a "clear mandate," like her collective action claims, lacks factual support.

Plaintiff next hypothesizes that O'Reilly's privilege log, whenever it would delivered, would be inadequate for two reasons: First, she contends that, regardless of its content, O'Reilly already had waived its work product privilege by failing to produce a privilege log on December 8, 2004 (the day before Plaintiff's deposition, but the date O'Reilly's response to the discovery was due). Therefore, according to Plaintiff, the privilege that attached to all of O'Reilly's attorneys' recorded, investigative witness interviews was *de facto* waived without any other showing by Plaintiff. (*See* Plaintiff's Brief at 3.)

Second, Plaintiff also hypothesizes that O'Reilly's counsel will have made a determination of what to include on whatever privilege log is produced based on "relevancy," and, Plaintiff contends, that analysis would violate "the Federal Rules" -- though no specific Federal Rule is mentioned. (*See* Plaintiff's Brief at 3.) On the contrary, however, Rule 26 has a relevancy threshold. Only after that threshold is reached must privilege even be considered.[10]

## H.   O'Reilly's Privilege Log

On January 6, 2005, about three weeks (and two holidays) later, O'Reilly served its privilege log on Plaintiff. (App. 065-105.) The privilege log lists all recorded interviews, and by name, identifies witnesses who were associated with Anna Salinas through Store 771 -- the store where Ms. Salinas said every one of her claims arose.[11] The log does not identify anyone else who was interviewed nor the stores in which they worked. The selection process used

---

[10] Plaintiff also appears to complain that O'Reilly's response to Request for Production No. 2 that it "collected no video surveillance tapes," is unclear as to "whether there really are no video surveillance tapes, or whether there simply are no video surveillance tapes featuring Anna Salinas" that have been collected. Plaintiff's Brief at 3, n.1. O'Reilly has collected no surveillance tapes of anyone in connection with this lawsuit.

[11] (App. 009 (Dep. at 40).)

reflects attorney work product. The log does name witnesses associated with Plaintiff at Store 771 and sets out the date of the recorded interview and the attorney interviewer. There are 119 interviews listed; O'Reilly has listed all of the investigative recordings of witness interviews obtained by its lawyers.

## II. SUMMARY

O'Reilly has fully and timely complied with Federal Rule of Civil Procedure 26(b)(5) and has not waived its investigative privilege under the work product doctrine.

As required under Rule 26(b)(5), O'Reilly timely and expressly asserted that its investigative materials were privileged work product in correspondence to Plaintiff's counsel dated November 12, 2004, and in O'Reilly's Responses to Plaintiff's Second Set of Interrogatories and Requests for Production served on December 8, 2004. In addition, once O'Reilly obtained sufficient factual information through Plaintiff's December 9, 2004 deposition testimony and December 15, 2004 transcript, and therefore was able to determine the relevance of its investigative materials, O'Reilly committed to produce and *did* produce a privilege log for the relevant and "otherwise discoverable" investigative materials. This occurred on January 6, 2005 (thereby mooting much of Plaintiff's Motion to Compel). O'Reilly has complied with the requirements of Rule 26(b)(5), and has not waived the work product privilege attached to the investigative materials at issue.

Significantly, however, Plaintiff, who bears the burden of proof, has neither argued nor proven (1) that the materials sought are "otherwise discoverable," or (2) that Plaintiff has a "substantial need" for the materials sought and is unable "without undue hardship" to obtain the "substantial equivalent." Failing either, Plaintiff is not entitled to the materials sought. Here, Plaintiff fails both requirements.

### III. ARGUMENT AND AUTHORITIES

**A.**    *O'Reilly has fully complied with the Federal Rules of Civil Procedure in asserting that the investigative materials at issue are protected by the work product doctrine.*

The work product doctrine protects from discovery (1) documents and tangible things (2) prepared in anticipation of litigation or for trial (3) by or for a party or a party's representative. FED. R. CIV. P. 26(b)(3); *Ferko v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 219 F.R.D. 396, 400 (E.D. Tex. 2003). As such, videotapes and transcripts of recorded interviews of employees of a corporate party taken by counsel in anticipation of litigation or for trial are protected from discovery under the work product doctrine. *See Smith v. WNA Carthage, L.L.C.*, 200 F.R.D. 576, 578 (E.D. Tex. 2001) (explaining that tape-recorded interview of defendant's employee would constitute work product if made with consent of taped witness); *Smith v. Diamond Offshore Drilling, Inc.*, 168 F.R.D. 582, 584 (S.D. Tex. 1996) (transcripts of recorded interviews of employees of defendant were work product). Under Rule 26(b)(5), a party usually must expressly assert a claim of privilege for such information and produce a privilege log adequately describing the information withheld in manner that "will enable other parties to assess the applicability of the privilege or protection." FED. R. CIV. P. 26(b)(5).

A party is required to produce a privilege log only for privileged information that is "otherwise discoverable." *Id.* By way of example, the Advisory Committee Note to the 1993 Amendments to Rule 26 explains that information that is not "otherwise discoverable," including irrelevant information, is not required to be described in a privilege log by a responding party:

> The obligation to provide pertinent information concerning withheld privileged materials applies only to items "otherwise discoverable." If a broad discovery request is made -- for example, for all documents of a particular type during a twenty year period -- and the responding party believes in good faith that production of documents for more than the past three years would be unduly burdensome, it should make its objection to the breadth of the request and, with respect to the documents generated in that three year period, produce the unprivileged documents and describe those withheld under the claim of privilege.

>If the court later rules that documents for a seven year period are properly discoverable, the documents for the additional four years should then be either produced (if not privileged) or described (if claimed to be privileged).

FED. R. CIV. P. 26 advisory committee note. Accordingly, a party need not include in its privilege log documents or tangible things that the party in good faith believes are not relevant to the case. *Id.*

The investigative materials at issue constitute attorney work product. These materials are comprised of videotapes and transcripts of recorded interviews of O'Reilly employees taken by Don Luttrell and John Williams, O'Reilly's counsel, after Plaintiff filed her Complaint and before Plaintiff had provided any information whatsoever about the factual basis for her personal and collective action claims. O'Reilly's counsel's purpose was to potentially aid in the present litigation if the information obtained in such interviews was subsequently determined to be relevant. As such, O'Reilly's investigative materials clearly fall within the protection of the work product privilege and can be discovered *only* upon a showing that Plaintiff has a "substantial need" for such materials and "is unable without undue hardship to obtain the substantial equivalent." FED. R. CIV. P. 26(b)(3).

The purpose of shielding work product from discovery is to require each side to do its own work, at its own expense, and to prevent a less diligent party from "perform[ing] its functions either without wits or on wits borrowed from the adversary." *Hickman v. Taylor*, 329 U.S. 495, 516 (1947); *Estavez v. Matos*, 125 F.R.D. 28, 31 (S.D.N.Y. 1989). The law therefore creates a demanding burden because discovery of an attorney's work product punishes the conscientious party whose attorney whose attorney has diligently gathered information in preparation to defend his case. Plaintiff, has neither articulated nor attempted in her Motion to

Compel to show that she has met this high burden and is therefore not entitled to discovery of such materials.

Furthermore, O'Reilly has complied with the requirements of Rule 26(b)(5) to preserve the work product privilege. O'Reilly timely and expressly claimed that the investigative materials at issue are privileged work product, both in correspondence to Plaintiff's counsel on November 13, 2004 and in its Responses to Plaintiff's Second Set of Interrogatories and Requests for Production served on December 8, 2004. (App. 052-054 (11/13/04 Letter from TV to BE); App. 056-064 (O'Reilly's 12/06/04 Objections and Responses to Plaintiff's Second Set of Interrogatories and Requests for Production).) Furthermore, O'Reilly committed on December 15, 2004 to produce a privilege log for the relevant and therefore "otherwise discoverable" investigative materials, (App. 055 (12/15/04 Letter from TV to BE)), and did in fact produce such privilege log on January 6, 2005. (App. 065-0105 (O'Reilly's Privilege Log).) O'Reilly went beyond its obligations under Rule 26(b)(5) and included information in the privilege log regarding the interviews of the non-store 771 employees -- information that is irrelevant in light of Ms. Salinas' deposition testimony and the known facts in this case, and that is therefore not "otherwise discoverable" under Rule 26(b)(5). (*Id.*)

Furthermore, Plaintiff's counsel overstates the alleged delinquency of O'Reilly's privilege log. Rule 26(b)(5) does not provide a deadline by which a party is required to produce a privilege log to opposing counsel, and Plaintiff does not identify any basis to support her arbitrary deadline of 15 days. (App. 106-07 (12/06/04 Letter from BE to TV)). Nevertheless, O'Reilly produced its privilege log to Plaintiff within a reasonable time after asserting its claim of privilege. As noted above, O'Reilly asserted its claim that the investigative materials were work product on November 12, 2004 and again on December 8, 2004, the date when discovery

responses and privilege claims actually were due. On December 15, with Plaintiff's deposition transcript in hand, O'Reilly committed to produce a privilege log for relevant and "otherwise discoverable" investigative materials and did produce such log on January 6, 2005.

Moreover, O'Reilly could not have produced a meaningful privilege log any sooner. Plaintiff's continued refusal to provide O'Reilly with any factual basis for her broadly-stated claims prevented O'Reilly from determining whether any portion of its investigative materials was on point and, therefore, "otherwise discoverable." Indeed, until Plaintiff was deposed on December 9, 2004, she ignored O'Reilly's requests for basic and necessary factual information, including the nature of the "off the clock" work she claims to have performed, any common policy or practice by O'Reilly that allegedly violated the Fair Labor Standards Act ("FLSA"), or how she and the "opt-in" employees are "similarly situated." (App. 117, 51-52.) Plaintiff's Complaint and Initial Disclosures were utterly bereft of facts. Accordingly, it was only after December 15, 2004 (the date Plaintiff's deposition transcript issued) that O'Reilly was able to reasonably determine which portions of O'Reilly's investigative materials were "otherwise discoverable" and therefore appropriate to include in its privilege log.

## IV. CONCLUSION

The Plaintiff has no basis for prosecuting a collective action as a representative plaintiff. Her testimony is clear, compelling and conclusive. Plaintiff's Motion to Compel is completely disconnected from the testimony that she, the *only* representative plaintiff, provides. O'Reilly's extensive effort to ascertain the basis for Plaintiff's allegation through the privileged work product of its attorneys is so remote from the case development that should be taking place, that it is disturbing. Was Anna Salinas denied overtime by her store manager, Ronnie Everage, under the four circumstances to which she testified, or was she not? That is the question. O'Reilly's work product is not.

For the reasons stated herein, O'Reilly respectfully requests that this Court deny Plaintiff's Motion to Compel.

Respectfully submitted,

BAKER BOTTS, L.L.P.

OF COUNSEL:
Eric Senske
State Bar No. 18027100
BAKER BOTTS, L.L.P.
2001 Ross Avenue
Dallas, TX 75201
(214) 753.6500 (Telephone)
(214) 753.6503 (Fax)

By: _____
Teresa S. Valderrama
State Bar No. 20422500
Kathryn S. Vaughn
State Bar No. 00785144
One Shell Plaza
910 Louisiana
Houston, Texas 77002
Telephone: (713) 229-1234
Facsimile: (713) 229-1522

John M. Williams
State Bar No. 21554200
L. Don Luttrell
State Bar No. 12708630
LUTTRELL AND WILLIAMS, P.C.
3000 Weslayan, Suite 350
Houston, Texas 77027
Telephone: (713) 877-1077
Facsimile: (713) 877-1089

ATTORNEYS FOR DEFENDANT
O'REILLY AUTOMOTIVE, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been sent to the

following counsel of record this the 11th day of January 2005:

Brady Edwards
EDWARDS & GEORGE, L.L.P.
1000 Louisiana, Suite 1300
Houston, Texas 77002

Derek Braziel
EDWARDS & GEORGE, L.L.P.
208 N. Market Street, Suite 400
Dallas, Texas 75202

Richard J. (Rex) Burch
BRUCKNER BURCH PLLC
5847 San Felipe, Suite 3900
Houston, Texas 77057

Teresa S. Valderrama