IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ANNA SALINAS, on her behalf and on behalf of those similarly situated, | §<br>§<br>§ | |
| Plaintiff, | §<br>§ | Civil Action No. 3:04-CV-1861-B<br>ECF |
| v. | §<br>§ | |
| O'REILLY AUTOMOTIVE, INC., | §<br>§ | |
| Defendant. | §<br>§ | |

## O'REILLY'S RESPONSE BRIEF REGARDING
## SCOPE OF "SIMILARLY SITUATED" EMPLOYEES AND DISCOVERY

BAKER BOTTS L.L.P.

Teresa S. Valderrama
State Bar No. 20422500
Kathryn S. Vaughn
State Bar No. 00785144
One Shell Plaza
910 Louisiana
Houston, Texas  77002
Telephone:  (713) 229-1234
Facsimile:   (713) 229-1522

OF COUNSEL:
Eric Senske
State Bar No. 18027100
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX 75201
(214) 753.6500 (Telephone)
(214) 753.6503 (Fax)

LUTTRELL & WILLIAMS, P.C.

John M. Williams
State Bar No. 21554200
L. Don Luttrell
State Bar No. 12708630
3000 Weslayan, Suite 350
Houston, Texas  77027
Telephone:  (713) 877-1077
Facsimile:   (713) 877-1089

ATTORNEYS FOR DEFENDANT
O'REILLY AUTOMOTIVE, INC.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

I.    PROCEDURAL BACKGROUND .................................................................... 1

      A.    March 10, 2005 Hearing and March 11, 2005 Order ............................. 1

      B.    Plaintiff's Brief ..................................................................................... 1

II.   SUMMARY OF ARGUMENT ......................................................................... 4

III.  DISCUSSION OF FACTS ............................................................................... 6

      A.    Plaintiff's Pleadings and Disclosures Support Neither a Corporate-Wide,
            Similarly-Situated Finding, Nor Corporate-Wide Discovery of Names and
            Addresses. ............................................................................................. 6

            1.   Allegations in Complaint ............................................................ 6

            2.   Initial Disclosures and Supplemental Initial Disclosures ............ 7

      B.    Plaintiff's Testimony Affirmatively Defeats the Allegations in Her Complaint that
            She Is Similarly-Situated to any Putative Collective Action Class. ........ 7

            1.   Plaintiff's Five Store Locations at O'Reilly ............................... 8

            2.   No Unpaid "Regular" Pay Except Eight Hours from Final Paycheck ........ 8

            3.   Failure to Pay Overtime Hours Alleged Only at Store 771 ......... 8

            4.   Overtime Pay Problem at Store 771 Alleged Only as to Ronnie Everage.. 8

            5.   No Systemic Overtime Pay Issue Exists ................................... 10

            6.   Even Plaintiff's Overtime Claims Against Ronnie Everage Are Limited to
                 Factual Circumstances Unique to Plaintiff ................................ 10

            7.   Plaintiff Makes No Claim that She Was Not Paid for Store Closing Duties.
                 ..................................................................................... 12

      C.    Plaintiff's Co-Workers Addresses Have Been Disclosed to Plaintiff's Counsel.. 12

            1.   Co-Workers at Store 771 Identified by Plaintiff as Having Claims ......... 12

            2.   Opt-In Seay ........................................................................... 13

D. None of Seven "Opt-Ins" Has Provided Evidence of a "Factual and/or Legal Nexus Binding Plaintiff to [Themselves] as Victims of a Policy or Practice" by O'Reilly...................................................................................................... 14

    1. Lionel Flores Declaration ......................................................................... 14

    2. Jay O'Neal Declaration............................................................................. 15

E. Evidence Already within Plaintiff's Control Should Be Sufficient to Substantiate Whether the Putative Collective Action Class Sought by Plaintiff Is Viable....... 16

F. O'Reilly Properly Accounted for and Paid Overtime on Plaintiff's Commissions. ...................................................................................................................... 17

    1. O'Reilly's Formulas for Payment of Commission Comply with 29 CFR 778.120..................................................................................................... 17

    2. Plaintiff Knows that O'Reilly's Commissions Are Calculated and Paid in Compliance with Federal Law. ................................................................. 19

IV. DISCUSSION OF AUTHORITIES ................................................................... 20

A. The Collective Action Conditional Certification Standard.................................... 20

B. The "Similarly Situated" Tandard Urged by Plaintiff Contradicts the Controlling Standard Used by Courts Within the Fifth Circuit................................................. 21

C. Plaintiff's Authorities Do Not Support that She May Discover Names and Addresses of Putative Class Members before Establishing a "Similarly Situated" Nexus. ................................................................................................................... 23

V. CONCLUSION................................................................................................... 28

## TABLE OF AUTHORITIES

### CASES

*Aguilar v. Complete Landsculpture, Inc*
    2004 WL 2293842 (N.D. Tex. Oct. 7, 2004)................................................................22, 26

*Bailey v. Ameriquest Mortgage Co*..................................................................................................27

*Barnett v. Countrywide Credit Indus., Inc., No. Civ. A.3:01-CV-1182-M,*
    2002 WL 1023161 (N.D. Tex. May 21, 2002) (App. 097-98) ..........................................26

*Barron v. Henry County Sch. Sys.,*
    242 F. Supp. 2d 1096 (M.D. Ala. 2003) ............................................................................23

*Camp v. Lockheed Martin Corp.,*
    No. H-97-1938, 1998 WL 906915 (S.D. Tex. Apr. 23, 1998) (App. 091-94)..............22, 26

*Grayson v. K Mart Corp.,*
    79 F.3d 1086 (11th Cir. 1996) ............................................................................................22

*H&R Block Ltd. v. Housden,*
    186 F.R.D. 399 (E.D. Tex. 1999)..................................................................21, 22, 24, 26

*Hipp v. Liberty National Life Insurance Co.,*
    252 F.3d 1208 (11th Cir. 2001) ..........................................................................................23

*Hoffman-La Roche Inc. v. Sperling,*
    493 U.S. 165 (1989)...............................................................................................21, 27, 28

*Lusardi v. Xerox Corp.,*
    118 F.R.D. 351 (D.N.J. 1987)..................................................................................7, 23, 28

*Marsh v. Butler  County Sch. Sys.,*
    242 F. Supp. 2d 1086 (M.D. Ala. 2003) ............................................................................22

*Miklos v. Golman-Hayden Co*
    No. CIV. A. 2:99-CV-1279,2000 WL 1617969 (S.D. Ohio Oct. 24, 2000) ..............1, 25, 26

*Mooney v. Aramco Servs. Co.,*
    54 F.3d 1207 (5th Cir. 1995) .............................................................6, 7, 21, 22, 23, 26, 29

*Tucker v. Labor Leasing, Inc*
    155 F.R.D. 687 (M.D. Fla. 1994)........................................................................................25

*Villatoro v. Kim Son Rest., L.P.,*
    286 F. Supp. 2d 807 (S.D. Tex. 2003) ...................................................................22, 23, 26

*Weaver v. Wal-Mart Stores, Inc.,*
    Civ. Action No. 2-02-CV-220 (TJW) (E.D. Tex. Aug. 23, 2004)......................................28

Defendant O'Reilly Automotive, Inc. ("O'Reilly") files this Response Brief Regarding Scope of "Similarly Situated" Employees and Discovery.

## I.     PROCEDURAL BACKGROUND

### A.     March 10, 2005 Hearing and March 11, 2005 Order

On March 10, 2005, this Court heard argument on various motions, including O'Reilly's Motion for Protection and to Stay Collective Action Class Discovery, and issued its March 11, 2005 Order requiring, in part, that the parties attempt to reach agreement on the scope of "similarly-situated" individuals. Specifically, the Court directed that Defendant "provide the Plaintiff with the names and addresses of Defendant's employees that are similarly-situated to Plaintiff." (Order ¶ 4, Dkt. No. 116.) However, to ascertain which names and addresses should be provided, the parties also were "directed to confer . . . on how to define such 'similarly situated' individuals" and, "[i]f agreement cannot be reached, the parties may submit briefing on the issue to the Court, including whether there exists a factual and/or legal nexus binding Plaintiff to potential class members as victims of a policy or practice of Defendant." (*Id.*) The Court then would, "if necessary, determine the scope of discovery, if any, that shall be conducted before Plaintiff moves for conditional certification." (*Id.*)

The parties were not able to agree regarding which individuals are similarly-situated to Plaintiff.

### B.     Plaintiff's Brief

On March 31, 2005, Plaintiff submitted her brief on the issues ("Plaintiff's Brief"). Plaintiff's Brief takes two positions: First, Plaintiff argues that she should not be required to establish any nexus between herself and other employees or former employees, apart from her generally pleaded allegations of "off the clock" work, in order to discover the names and addresses of O'Reilly hourly-paid employees and former employees at its retail stores

corporate-wide. Plaintiff asserts she is entitled to this information "so she can investigate her allegation" that they are similarly-situated. (Pl.'s Br. 3-4.) Specifically, Plaintiff contends that "to make the requisite showing for class notice under the FLSA, Plaintiff must be allowed to know the identities of those she seeks to represent so she can gather evidence to support her allegations." (Pl.'s Brief at 2.) She complains that the Court's use of the "similarly-situated" test "as the gatekeeper for discovery is unnecessary." *Id.* In other words, according to Plaintiff, filing a complaint alleging a collective action under the FLSA entitles a plaintiff to obtain names and addresses of those she alleges are similarly situated, and to fish at will for others to join the action, regardless of the viability of the claim. As explained at Part IV, *infra.*, Plaintiff's argument is unsupported by the cases she cites, is without statutory support, and contradicts Fifth Circuit authority.

Recognizing, however, that the Court *is* requiring that Plaintiff meet the proper "similarly-situated" nexus, Plaintiff's proposes "two different policies/practices that violate the FLSA and apply to potential class members" as the alleged requisite nexus. (Pl.'s Br. at 5.) First, Plaintiff contends:

> she performed work off the clock for which she was not paid in accordance with the FLSA. ... Specifically, after her shift was over, she was required to perform end-of-the-day closing duties such as running the end-of-the-night tape or the end-of-the-month tape or counting cash drawers. This was not counted as work time.

*Id.* at 6; *see also id.* at 8. Plaintiff then asks the Court to infer from corporate e-mails reminding O'Reilly store and regional managers *to comply* with wage and hour laws that FLSA violations are "widespread."[1] (*Id.* at 8-9.)

---

[1] It is unclear how Plaintiff reaches the conclusion that a corporate-initiated directive to follow the law is evidence of a widespread corporate-initiated directive to violate the law. Moreover, courts should not, as a matter of policy, promote compliance directives as materials that give rise to collective actions.

2

Plaintiff's Brief offers allegations, but no evidence or record cite, other than the e-mail compliance reminders, of *any* nexus between Plaintiff and the putative nationwide class of hourly-paid, retail store employees. Moreover, notwithstanding the repeated claim that Plaintiff's counsel has many clients, nationwide, who contend they have not been paid overtime for "off-the-clock" work, Plaintiff offers no evidence of any nexus between the undisclosed "claims" of the claimants known to Plaintiff's counsel, and the idiosyncratic, personal claims of the representative Plaintiff here.[2]

Second, Plaintiff asserts as a basis for her "off-the-clock" collective action a policy/practice completely unrelated to "off-the-clock" work at all—specifically, Plaintiff now alleges that her commission pay each month was not properly incorporated into the regular rate of pay. This unpleaded, overtime commission pay claim not only is without a factual basis, but because of voluntary disclosures by O'Reilly about the calculation of Plaintiff's commission pay, Plaintiff's counsel is well-informed that this theory is without factual basis.[3]

Finally, looking to these two proposed "policies/practices," Plaintiff asserts that, although the list below is "only a subset of the potential class," she is entitled to the names and addresses of the following individuals to allow her "to make the notice stage showing":

> Persons who: 1) received commissions in addition to their hourly pay; or 2) whose responsibilities included : a) counting cash drawers and/or b) running tape either at the end-of-the-day or end-of-the-month."

(Pl.'s Brief at 9 and fn.1.) The names and addresses sought by Plaintiff, as defined above, would include nearly all hourly-paid, retail store employees nationwide—thousands of names and addresses.

---

[2] *See* Part III.E , *infra.*

[3] *See* Part IV.F, *infra.*

## II.    **SUMMARY OF ARGUMENT**

Plaintiff's proposed discovery is improper at many levels.  Procedurally, Plaintiff seeks to obtain through this briefing process relief that already has been denied by the Court. Rather than focus her claims on viable theories based on her own testimony, thereby narrowing the case and advancing it to resolution, Plaintiff seeks to obtain broad discovery that is not warranted or appropriate, citing case law from other circuits and district courts that, when reviewed, does not support her proposition.  The controlling law, and the frailty of Plaintiff's authorities, is addressed at Part IV, *infra*.

However, of greater significance perhaps than the deficiencies in the legal authorities cited in Plaintiff's Brief, again at many levels, is Plaintiff's proposal setting forth the two "policies/practices" that she now contends create an alleged "nexus" connecting Plaintiff to the corporate-wide class that she is determined to pursue.   Plaintiff's two proposed policies/practices not only are not supported by any record cite, but they are contrary to fact.  By ignoring Plaintiff's own testimony and, instead, alleging what, at best, might be considered "hypothetical" claims (such as a purported refusal to pay Plaintiff for time spend counting her cash drawer), Plaintiff seeks to broaden the scope of this action well-beyond any role that she could ever hold as a representative plaintiff under Section 216(b) of the FLSA.

Similarly, the unpleaded and newly-pursued "failure to pay overtime on commissions claim," which ignores data that Plaintiff's counsel holds in his hands showing that O'Reilly is compliant with federal law and Department of Labor ("DOL") regulations, is at best a misguided maneuver.  Plaintiff interjects this futile issue into this litigation at this juncture, apparently for the sole purpose of obtaining names and addresses of hourly-paid employees corporate-wide.

Frankly, a defendant can directly disprove a plaintiff's allegations, *i.e.* prove a negative, very rarely. O'Reilly has done so with this Plaintiff's corporate-wide collective action claims through Plaintiff's own testimony and through data about commissions voluntarily provided to Plaintiff. For Plaintiff now to broadly assert collective action claims that fly in the face of her own testimony as the representative Plaintiff, and in disregard for the commission calculations data known to her, is costly and counterproductive, and treads upon credibility.

In sum, Plaintiff is wrong, factually and legally, that the alleged policies or practices that she references either make her similarly-situated to a national class of hourly-paid retail store employees or entitle her to the discovery she seeks. Neither of the two claimed "policies/practices" alleged in Plaintiff's Brief are factually true. Moreover, Plaintiff's testimony does not support the "post-closing" duties allegation in her Brief, and Plaintiff's counsel has in hand the data showing that Plaintiff's commission payments are paid in compliance with DOL overtime pay regulations.[4]

Ultimately, Plaintiff's stance that no nexus is required between Plaintiff's claims and the targeted putative class before Plaintiff's counsel may obtain the names and addresses of O'Reilly hourly-paid employees is untenable. Even without Plaintiff's testimony that the alleged pay violations she complains of were due solely to the conduct of her immediate boss, Ronnie Everage, the similarly-situated language of Section 216(b), as applied by the Fifth Circuit in *Mooney*, requires a nexus—as this Court has ordered. Moreover, Plaintiff's efforts to discover names and addresses of O'Reilly employees and former employees for the apparent purpose of contacting such individuals outside the Court's supervision and without first having satisfied

---

[4] *See* Part II.F; *infra*.

even the minimal requirements of *Mooney*, cannot be supported.[5]  In the end, Plaintiff offers a

"three-step" approach to collective actions that turns *Mooney* on its ear.

Plaintiff now has, and has had for a long time, if it exists, the evidence necessary

to move for conditional certification.  That she has not done so speaks volumes.

## III.    DISCUSSION OF FACTS

The Court's question "whether there exists a factual and/or legal nexus binding

Plaintiff to potential class members as victims of a policy or practice of Defendant" cannot be

divorced from the Plaintiff's specific, factual claims.  Hence, a recap of Plaintiff's claims -- as

they have developed factually -- is essential to determining whether the nexus exists for

identifying any group similarly-situated to Plaintiff.

**A.    Plaintiff's Pleadings and Disclosures Support Neither a Corporate-Wide, Similarly-Situated Finding, Nor Corporate-Wide Discovery of Names and Addresses.**

### 1.    *Allegations in Complaint*

On August 26, 2004, Plaintiff filed an Original Collective Action Complaint

alleging that she and "similarly situated" O'Reilly employees were required to work "off the

clock" in violation of the Fair Labor Standards Act ("FLSA").  (Complaint ¶ 3.)  Plaintiff's

Complaint alleges that the putative collective action participants "are those employees who are

similarly situated to Plaintiff in that their relevant job duties and pay provisions were similar to

---

[5] While O'Reilly does not know with certainty what footnote 1 to Plaintiff's Brief means, it suggests that Plaintiff's counsel intends to use names and addresses that Plaintiff now seeks from O'Reilly in a very unorthodox manner. Specifically, Plaintiff's counsel apparently intends to solicit without court supervision the persons whose names and addresses Plaintiff seeks to have disclosed. From contacts with those persons, Plaintiff's counsel apparently intends to obtain evidence to make a "notice stage showing," the *first* showing under the *Lusardi* test.  (*See* Pl's Brief at 9 fn.1.)  Plaintiff's counsel then apparently intends to expand the definition of the collective action class to encompass the "other off-the-clock" practices that Plaintiff's counsel says he would "be justified" in discovering -- the items regarding which O'Reilly sent email reminders to its managers but which do not in any way pertain to Plaintiff's claims.  Pl's Brief at 8-9, and fn.1.  Hence, nine months into this case, after the deadline for amending pleadings has passed, after the deadline for a motion for conditional notice, Plaintiff apparently expects to begin three phases of substantive discovery.  O'Reilly has found no court applying *Lusardi* or *Mooney*, or any other test, that has ordered a defendant to disclose names and addresses for purposes other than to facilitate a court-supervised notice.

Plaintiff."[6]  Apart from this bare-bones conclusion as to the proper putative class, the Complaint provides no specifics, other factual support, or any explanation of the basis for a collective action. (Complaint ¶ 3.) Hence, the Court and O'Reilly must look elsewhere, and have looked elsewhere, for "substantial allegations" upon which Plaintiff's collective action claims might rest.

### 2. Initial Disclosures and Supplemental Initial Disclosures

After filing suit, Salinas served initial disclosures. These disclosures lack any facts to support a collective action. No documents supporting either the Plaintiff's claims or a collective action were identified.[7] (App. 001-21.) To date, none of the information provided in Plaintiff's initial disclosures or supplemental disclosures provide "substantial allegations" that might support Plaintiff's purported "off-the-clock" collective action claims.

### B. Plaintiff's Testimony Affirmatively Defeats the Allegations in Her Complaint that She Is Similarly-Situated to any Putative Collective Action Class.

Contrary to the sweeping contentions of the Complaint, reprised in Plaintiff's Brief, Plaintiff is suing over isolated, local grievances between herself and her local O'Reilly store manager at the time, Ronnie Everage ("Everage"). Her testimony about her claims conclusively establishes that her complaints were local to Store 771 and to Everage, making Plaintiff's efforts to obtain the names and addresses of employees nationwide a gross overreach.

---

[6] Plaintiff's Brief describes the relevant putative class as current or former hourly-paid, retail store employees nationwide, an expansion of her pleadings. *See* Pl.'s Br. at 2. However, she seeks, prior to any motion for conditional certification, the names and addresses of a "subset" of employees that, for all practical purposes, is equivalent to this corporate-wide class. (Pl.'s Br. at 9.)

[7] Subsequent disclosures by Plaintiff adopted information provided through O'Reilly's disclosures, identified scattered persons who filed consents (as might be anticipated, in response to Plaintiff's advertisements about her "nationwide" lawsuit), listed certain of Plaintiff's former co-workers, identified local management as persons to whom Plaintiff had complained, and stated a precise damages amount ($14,525.36) with no explanation of the methodology supporting it. At deposition, Plaintiff confirmed that she didn't know how the damages amount was calculated nor what it includes.

### 1.    *Plaintiff's Five Store Locations at O'Reilly*

Since Plaintiff first began work for O'Reilly on December 20, 1999, (App. 023 (Dep. at 9)), until she quit on May 7, 2004 (App. 029 (Dep. at 35)), Plaintiff worked at five O'Reilly store locations: Fort Worth (twice), Burleson, Mansfield (twice), Duncanville and Midlothian. (App. 023-26 (Dep. at 9-20).) She had substantial experience with O'Reilly across these five store locations.

### 2.    *No Unpaid "Regular" Pay Except Eight Hours from Final Paycheck*

Plaintiff was paid for all regular (non-overtime) hours she worked at every store location except for eight hours she claims were shorted from her last paycheck.[8]

### 3.    *Failure to Pay Overtime Hours Alleged Only at Store 771*

Significantly, Plaintiff was paid for all overtime hours she worked except at one O'Reilly store -- store number 771 in Mansfield.[9]

### 4.    *Overtime Pay Problem at Store 771 Alleged Only as to Ronnie Everage*

Even at the Mansfield store, Plaintiff testified that store manager Everage was the *only* store manager, of all those whom she had at the store, whom -- she contends -- did not pay

---

[8] Q. Okay. Other than this eight hours of regular time that you are saying you didn't receive on your last paycheck that doesn't appear in your lawsuit, is there any other period or periods of time that you worked for O'Reilly that you are claiming you did not receive every hour of your regular pay?

A.  I got every hour.

Q.  So today we are only dealing with, in your allegation, eight hours of regular time you say you weren't paid and then whatever overtime we are going to discuss you claim you weren't paid?  Am I correct?

A.  Yes, sir.

(App. 028 (Dep. at 32-33) (objection omitted).)

[9] Q. All right.  In fact, it is my understanding in this case -- and correct me if I am wrong --

A.  Yes, sir.

Q.  -- this claim you are making where you are saying you are owed overtime hours that you were not paid, you are claiming all of that occurred at store 771, the Mansfield store.  Am I right on that?

A.  Yes, sir.

(App. 030 (Dep. at 40).)

her, and others, for overtime hours.[10]  In fact, while at Store 771, before Ronnie Everage became

her store manager, Plaintiff recalled many other "good" store managers.[11]  Similarly, outside of

Store 771, Plaintiff was properly paid overtime by store managers other than Ronnie Everage.[12]

---

[10] Q.    Ms. Salinas, if I have heard you correctly today -- and I think I have but correct me if I misspeak, but it appears to me that the gist of what you are claiming here today as to overtime which you say that you worked and were not paid, you're -- you're claiming that it goes back to issues with Ronnie Everage in causing you not to get paid that overtime.  Is that what I have heard from you today?

A.  Yes, sir.

Q.  Okay.  And the same thing for these other people that you have claimed that may or may not have overtime issues, it appears that you are also claiming their issues are tied to the manager, Ronnie Everage?

A.  Yes, sir.

Q.  I haven't heard you say it is someone else's fault other than issues they had with him.  Am I correct on that?

A.  Yes, sir.

(App. 044 (Dep. at 200-01) (objection omitted).)

[11] Q. Okay.  Did you ever work any overtime under Mr. Beale?

A.  I might have, and if I did I'm sure he paid it.

Q.  Okay.  So as long as Mr. Beale was manager you are not claiming in this lawsuit you are owed for any overtime during any period of time Mr. Beale was there?

A.  Oh, no, sir.

Q.  Okay.

A.  He was a good manager.

(App. 034 (Dep. at 86) (emphasis added); *see also* App. 034 (Dep. at 87).)

[12] Q.    Okay.  All right.  And had you gotten along well [with] Mr. Carter when he was your manager?

A.  Yes, sir.  He was one of the best managers O'Reilly ever had.

(App. 027 (Dep. at 26) (emphasis added).)

Q.  So is it your testimony here today that the entire time you worked with O'Reilly you never had a check that had overtime on it?

A.  No, sir.  When I first started out with O'Reilly's I got hired in by Dan Dowell.

Q.  Yes, ma'am.

A.  I think I started out at $8, 8.50.  I'm not sure.  Dan Dowell promised my [sic] five hours overtime a week for me driving so far.  That was fine.  I did it, did it, and did it for a while, and then all of a sudden it slacked off.  That was fine.

When they could they would give me overtime, but that was under that store over there.  That was good.  It was all correct.  I didn't have any problems with it.

(App. 030 (Dep. at 39) (emphasis added).)

Q.  So you are saying when you were at the Fort Worth store the two different times you worked there -- that is what you are talking about, right?

A.  Yes, sir.

### 5.    *No Systemic Overtime Pay Issue Exists*

Clearly, Plaintiff's overtime pay dispute does not concern some systemic problem with O'Reilly's overtime pay policies and practices. At four out of the five stores where Plaintiff worked she had no problem whatsoever. And within the one store where Plaintiff contends her problem with overtime pay arose, her troubles related to only a single manager, Ronnie Everage. The others were, for the most part, "good" managers and Plaintiff ordinarily was paid all she was due while working for them -- even at the Mansfield store.

Additionally, on at least one occasion, under store manager Lowrey, when Plaintiff objected that she had not been paid for eight hours of overtime she had worked, the district manager fixed the problem immediately. (App. 035, 040 (Dep. 94-95; 117).)

### 6.    *Even Plaintiff's Overtime Claims Against Ronnie Everage Are Limited to Factual Circumstances Unique to Plaintiff*

Finally, even as to the complaints Plaintiff did have while an O'Reilly team member -- *i.e.*, at Store 771 while managed by Ronnie Everage -- the specific overtime pay claims that Plaintiff asserts are personal and anecdotal. Plaintiff's claims, per her testimony, concern factual circumstances that are not generally transferable to other hourly-paid team members who worked at Store 771 under Ronnie Everage.

Plaintiff testified about four separate circumstances giving rise to her overtime pay claims against Ronnie Everage while working at Store 771. They are as follows:

---

Q.   You are saying all during that time period your checks were always correct? Is that what you are saying?

A.   Yes, sir. They were good managers. Whenever we signed for our checks they would ask us to look at our hours that was brought in, and if we had any questions we would ask the **manager. *It was taken care of.***

Q.   You always got all your overtime, is what you are saying?

A.   Uh-huh.

Q.   You always got paid for it?

A.   Yes, sir.

(App. 030 (Dep. at 40) (emphasis added).)

- On six occasions between January 2004 and April 2004, Plaintiff alleges she and another employee, Jacob Clay,[13] were required to stay late to handle "tape backup" responsibilities, and Plaintiff alleges neither she nor Clay were paid overtime for this. (App. 031, 043 (Dep. at 74-75; 135-36).)

- Once, when Everage was on vacation with his wife in June or July of 2003, Plaintiff alleges she and another employee named Mike[14] were instructed to report to work two hours early on a Saturday, and Plaintiff believes she and Mike were not paid for those two hours. (App. 040, 043 (Dep. at 115-16; 136).)

- On twenty or so occasions, Plaintiff alleges she came to work a half an hour before her scheduled start time and Everage would give her work to do in the store before her official start time. When she refused to do this unless he paid her for it, Everage told her she should leave and come back later, but not to be late for her shift. Plaintiff did not write her overtime on the schedule on these twenty occasions because, she believes, Everage deliberately put the schedule where it was too high for her to reach without climbing on a desk, which she didn't want to do. (App. 041-42 (Dep. at 126-28; 131-33).)

- From April 2003 until Plaintiff quit on May 7, 2004, Plaintiff alleges she was "singled out" to work through lunch nearly every day without being paid overtime.[15] (App. 039, 043 (Dep. at 112; 135-36).)

Each of these allegations arises out of unique circumstances that apply to Plaintiff. None arises from a systemic violation of the FLSA that warrants or might support a collective action for all hourly-paid retail employees corporate-wide and, indeed, plaintiff articulated no systemic policy or practice in her deposition. On the contrary, she affirmatively testified that at four out of five stores, she was paid for all overtime worked and that at Store 771, she was singled out by her manager, Ronnie Everage, and was not paid because of him.

---

[13] To the extent Jacob Clay is similarly situated to Plaintiff with respect to backup tape responsibilities, Clay's contact information was provided to Plaintiff on January 6, 2005.

[14] Mike Trainowski worked with Plaintiff at Store 771. To the extent Trainowski is similarly-situated to Plaintiff, Trainowski's contact information was provided to Plaintiff on January 5, 2005. Trainowski avers, however, that he is not owed any overtime and was paid by Everage for all hours worked. (*See* Dkt. No. 52, O'Reilly's App. to its Mot. for Partial Summ. J. at 001-02.)

[15] To the extent that co-workers identified by Plaintiff may have, she alleges sporadically, not have been paid for working during lunch, their contact information has been in Plaintiff's hands since January 5, 2005.

### 7. *Plaintiff Makes No Claim that She Was Not Paid for Store Closing Duties.*

Plaintiff's Brief recites, but offers no record cite to any testimony, that Ronnie Everage refused to pay Plaintiff for time spent counting "cash drawers" or running tapes after store closing. Pl.'s Br. at 5-6, 8, 9. Plaintiff testified in great detail regarding her claims and she makes no such allegation. *See* Part III.B, *supra*. While Plaintiff does allege that on six occasions, between January 2004 and April 2004, Ronnie Everage asked that she and Jacob Clay handle "tape backup duties" after store closing for which she believes she was not paid, *that's it*. (App. 031, 043 (Dep. at 74-75; 135-36).) Plaintiff never testified she was refused pay because work she performed was classified as "end of the day closing duties," as Pl.'s Brief now alleges. Pl.'s Br. at 5-6, 8, 9.

O'Reilly can defend against facts, but it is neither right, nor helpful in the resolution of this case, to require that O'Reilly defend against hypotheticals.[16] Plaintiff's testimony in this case forecloses any role for her as a collective action representative, on a "store closing duties" or "balancing of cash drawers" claim. Not only does Plaintiff's testimony so clearly establish that her claims are local to Store 771 and personal to Ronnie Everage, her manager, but the details of the claims that Plaintiff's Brief now recites as the basis for a nationwide putative collective action class are not claims made by Plaintiff.

### C. Plaintiff's Co-Workers Addresses Have Been Disclosed to Plaintiff's Counsel

### 1. *Co-Workers at Store 771 Identified by Plaintiff as Having Claims*

The Court's March 11, 2005 Order, requiring this briefing, noted that the Court seeks to determine "the scope of discovery, if any, that shall be conducted before Plaintiff moves

---

[16] The first time Plaintiff alleges she was not paid for "cash drawers" and "closing duties" is in her March 31, 2004 briefing. Earlier in March O'Reilly produced the corporate emails sent to its store managers reminding them to comply with wage and hour laws. These emails specifically remind managers, among other things, that balancing of cash drawers and closing duties are paid work. O'Reilly's production of the emails followed by Plaintiff's briefing of her claims to mimic the e-mails (unsupported by Plaintiff's actual testimony) is disconcerting.

for conditional certification." (Dkt. No. 116, ¶ 4.) Plaintiff's stance that she is entitled to the names and addresses of hourly-paid, retail store employees nationwide is addressed below. O'Reilly already has provided the addresses of the persons that Plaintiff testified she believed had claims because of what she observed of Everage's conduct at Store 771.

Plaintiff maintains that certain other employees in Store 771 agreed that she was owed overtime, or that Everage owed them overtime for circumstances unique to them, different from Plaintiff. The other employees named by Plaintiff included Jacob Clay, Cristina Malefant, Mike Trainowski, Donna Seay and John Williams. (App. 032-33, 039; 50 (Dep. at 81-82, 110-12).) The addresses for these individuals were long ago produced to Plaintiff.[17] Plaintiff's claim she is similarly-situated to any other individual seeking to make a claim against O'Reilly, *if not already foreclosed completely by her own testimony*, clearly can extend only to the individuals identified by Plaintiff as having their own complaints about Everage—or not at all. Plaintiff already has the names and addresses of these individuals. Thus, she has now, and has had for some time, the means to determine whether these individuals would join her lawsuit. No additional discovery is necessary.

### 2. *Opt-In Seay*

Donna Seay, an "opt in" represented by Plaintiff's counsel, has never provided an affidavit nor any substantial allegations describing her claims, even when seeking to become a plaintiff herself through an amended pleading. (Dkt. No. 58.) Seay worked at Store 771. Having been employed at the same store as Plaintiff, Seay's ability, if any, to present evidence that there exists "a factual and/or legal nexus binding Plaintiff to [Seay] as victims of a policy or

---

[17] These addresses were provided on January 5, 2005 in Defendant's First Set of Interrogatories. Trainowski, Malenfant and Williams each attest by affidavit that none of them has knowledge that Plaintiff was denied overtime pay and each was properly paid for all time worked. (*See* Dkt. No. 52, App. to O'Reilly's Mot. for Partial Summ. J., at 001-02, 011-12, 019-20.) Seay is, of course, an opt-in.

practice" clearly lies already within Plaintiff's own control.   No additional discovery is necessary.

**D.    None of Seven "Opt-Ins" Has Provided Evidence of a "Factual and/or Legal Nexus Binding Plaintiff to [Themselves] as Victims of a Policy or Practice" by O'Reilly.**

Since this case was filed in August 2004, and after Plaintiff's counsel issued a nationwide press release trumpeting the alleged nationwide collective action against O'Reilly, seven individuals, all former employees, filed consents to "opt in" should this suit become a collective action:   Donna Seay, Pat Gruesbeck, Lionel Flores, Jay O'Neal, Scott List, Kathy Hinton and Maryanne Harter.  Of these seven, two have filed declarations in this action:   Lionel Flores and Jay O'Neal.  Those declarations are discussed below.  Opt-in Donna Seay, a driver, worked with Plaintiff at Store 771, but has filed no declaration nor otherwise disclosed the basis for her claims.[18]   Nor have the remaining opt-ins disclosed their claims, through initial disclosures or otherwise.

Flores' and O'Neal's sworn statements do not support Plaintiff's effort to show she is similarly-situated to any particular putative class.

### 1.    Lionel Flores Declaration

On January 11, 2005, Lionel Flores signed a "declaration" stating that he worked at Store 454, his managers were Richard Roberts and Jessie Salazar, and that he was required to "to perform a variety of tasks without getting paid," including "to print a daily printout report, or 'end of the day' report."   (App. 046-47.)  Nothing in Flores' declaration reflects any "factual and/or legal nexus binding Plaintiff to [Flores] as victims of a policy or practice of Defendant."

---

[18] At the March 10, 2005 hearing, Plaintiff's counsel stated that none of the "opt-in" plaintiffs worked in the same store as Plaintiff, and that the putative "collective action class" did not purport to include corporate employees, warehouse employees or drivers.  (Dkt. No. 118 (3/10/05 Hearing Tr.) at 33, 35.)  Opt-in Seay was a driver in the same store as Plaintiff; opt-in Harter was a warehouse employee; opt-in Hinton was a secretary in the O'Reilly corporate offices.

In other words, Flores is not similarly-situated to Plaintiff, but asserts his own, idiosyncratic, personal local claim. Flores' allegations, such as they are, reflect completely dissimilar, nonspecific complaints, perhaps directed at two managers having no known connection to Plaintiff's claims, at a different store in a different Texas city (Houston).

Proof of Flores' allegations will in no way advance Plaintiff's claim that Ronnie Everage, out of all her managers, violated wage and hour laws in his treatment of her. Similarly, proof of Flores' allegation that his bosses knew he worked late, in no way advances Plaintiff's claim that Ronnie Everage made her work one Saturday with Mike Trainowski and didn't pay her, or that Jacob Clay and she stayed late six times between January and April 2004 to perform tape backup duties for which, she claims, she was not paid.

Flores and Plaintiff are just not similarly-situated.

### 2. Jay O'Neal Declaration

On November 3, 2004, Jay O'Neal signed a "declaration" that he had worked in two Oklahoma stores as an Assistant Manager, Night Manager and Dealer from February 1999 until October 2001. O'Neal alleges that as an "Assistant Manager and Dealer," he was never asked to clock in or out, regularly worked at least 50 hours a week, was paid for 45 hours of work (including five hours at time-and-a-half) per week, and was not paid for any hours over 45 per week. (App. 048-49.) He also contends that as Night Manager, he regularly worked at least 50 hours per week, but O'Reilly did not pay him for hours over 40 per week. (App. 048-49.)

O'Neal's allegations, which differ both from Plaintiff's allegations that Everage picked on her, and Flores' vague allegations that he worked late and ran computer printouts but was not paid overtime, again do not support any "factual and/or legal nexus binding Plaintiff to [O'Neal] as victims of a policy or practice of Defendant." O'Neal makes completely dissimilar complaints (a cap on paid hours worked), held jobs different from Plaintiff (Assistant Manager

and Dealer), reported to managers different from Plaintiff, worked in a different state, and had no

connection to Everage, whom Plaintiff alleges was the person responsible for the wage and hour

violations she claims occurred at Store 771  (App. 048-49.)

Nothing about O'Neal's allegation that he was not paid overtime for hours over

40 as Night Manager, nor for hours over 45 as an Assistant Manager and Dealer, affect

Plaintiff's claims.[19]  Were Plaintiff to prevail on her claims against Everage, her evidence would

do nothing to prove, or disprove, O'Neal's claims *because* no factual or legal nexus binds

O'Neal to Plaintiff as a victim of any O'Reilly policy or practice.  Plaintiff and O'Neal are not

similarly-situated.

**E.    Evidence Already within Plaintiff's Control Should Be Sufficient to Substantiate Whether the Putative Collective Action Class Sought by Plaintiff Is Viable.**

On August 26, 2004, when she filed her collective action complaint and issued

national press releases soliciting O'Reilly employees and ex-employees to contact her lawyers,

Plaintiff surely should have had some basis for asserting that a nationwide action was proper.

(App. 059-64.)  Whatever the evidence is that ostensibly supported a collective action complaint

on August 26, 2004, it surely should still be available to Plaintiff now in support of any motion

for conditional certification.

On March 10, 2005, Plaintiff's counsel repeatedly told the Court that individuals

from across the country had shared with him their complaints about off-the-clock work at

O'Reilly.  (Dkt. No. 118 (3/10/05 Hearing Tr.) at 6, 11, 12-13, 15, 16, 34, 56.)  For example,

Plaintiff's counsel told the Court that "we have a number of different plaintiffs who come to us

---

[19] O'Neal's claims are demonstrably false. O'Neal was paid time-and-a-half for hours worked over 40. (App. 050-058 (Excerpt from Ex. A to Def.'s Third Supp. Responses to Pl.'s First Set of Interrogs.).) Moreover, the hours for which he was paid each workweek were not limited to a mere 40 or 45. *Id.* While the truth of O'Neal's declaration is not an issue now, it demonstrates that no part of Plaintiff's claim against Everage affects, or is affected by, O'Neal's claim. A collective action linking Plaintiff and O'Neal would serve only to set a case originating in Oklahoma for trial in Dallas, notwithstanding the complete dissimilarity of the claims.

telling their own personal versions of essentially the same story," (*Id.* at 6) that "it's been our contention all along that our plaintiffs come to us and they say, 'This is what's happened to us. This is what we have experienced. This is what we've been through,'" (*id.* at 12-13) and that Plaintiff's counsel has "reports from a number of stores of the same type thing going on." (*Id.* at 34.) No details of the alleged complaints were provided then. None are contained in Plaintiff's Brief. Frankly, no evidence of the substance of any complaints, from which a factual or legal nexus with Plaintiff's claims might be determined, is disclosed. As with the elusive basis for Plaintiff's initial collective action filing, O'Reilly has no reason to conclude that the undisclosed alleged claims of individuals from across the nation who have contacted Plaintiff's counsel in any way support a collective action. However, that information is within Plaintiff's control and no additional discovery is required.

If a basis for a nationwide class of hourly-paid, retail store employees represented by this Plaintiff could exist, notwithstanding Plaintiff's testimony that her claims are local and personal to Everage, certainly the evidence for establishing that basis somehow should be evident in the many complaints Plaintiff's counsel told the Court he had received from O'Reilly employees. Moreover, although not demonstrated by the Flores or O'Neal affidavits, evidence of any nexus between Plaintiff and the seven opt-ins who look to Plaintiff's counsel as their counsel also rests already in Plaintiff's counsels' hands.

**F.     O'Reilly Properly Accounted for and Paid Overtime on Plaintiff's Commissions.**

*1.     O'Reilly's Formulas for Payment of Commission Comply with 29 CFR 778.120.*

The United States Department of Labor ("DOL") sets forth at 29 CFR 778.120 the rule which applies to calculation of deferred commission payments not identifiable as earned in a particular workweek. The regulation provides, in applicable part, as follows:

If it is not possible or practicable to allocate the commission among the

workweeks of the period in proportion to the amount of commission actually earned or reasonably presumed to be earned each week, some other reasonable and equitable method must be adopted. The following methods may be used:

\* \* \*

(b) Allocation of equal amounts to each hour worked. Sometimes, there are facts which make it inappropriate to assume equal commission earnings for each workweek. For example, the number of hours worked each week may vary significantly. In such cases, rather than following the method outlined in paragraph (a) of this section, it is reasonable to assume that the employee earned an equal amount of commission in each hour that he worked during the commission computation period. The amount of the commission payment should be divided by the number of hours worked in the period in order to determine the amount of the increase in the regular rate allocable to the commission payment. One-half of this figure should be multiplied by the number of statutory overtime hours worked by the employee in the overtime workweeks of the commission computation period, to get the amount of additional overtime compensation due for this period.

Example: An employee received commissions of $192 for a commission computation period of 96 hours, including 16 overtime hours (i.e., two workweeks of 48 hours each). Dividing the $192 by 96 gives a $2 increase in the hourly rate. If the employee is entitled to overtime after 40 hours in a workweek, he is due an additional $16 for the commission computation period, representing an additional $1 for each of the 16 overtime hours.

29 C.F.R. 778.120. O'Reilly's method for calculating commissions for O'Reilly Team Members like Plaintiff complies with this DOL regulation.

O'Reilly pays commission to certain of its retail store Team Members, including Plaintiff, based on 1) their personal sales for the month or 2) the store average of Team Member sales per month, whichever is greater. The formula for calculating the commission amount differs, based upon whether the Team Member's sales or the store average of Team Member sales is used. Hence, there are two different formulas used to calculate commissions and overtime on commissions, both of which are DOL compliant. The methodology for payment of commission under both formulas is set out in the attached affidavit of O'Reilly's Chief Financial Officer, James R. Batten, and the spreadsheet Exhibit attached to it. (App. 065-068.)

As Batten's Affidavit shows, Team Members receive not only the commission amount earned under whichever formula applies for the commission period (a month), but each Team Member receives an additional increment of pay that accounts for overtime due to overtime hours worked during the period. (*Id.*) This is paid at an additional "half" of the hourly rate calculated for the commission period. (App. 066 ¶ 5d, 067 ¶ 6d.)

### 2. Plaintiff Knows that O'Reilly's Commissions Are Calculated and Paid in Compliance with Federal Law.

On December 28 and 29, 2005, O'Reilly voluntarily gave Plaintiff's counsel the information necessary for Plaintiff to ascertain that overtime on her commissions is properly paid. O'Reilly did so, even though this is not a pleaded claim as it in no way constitutes "off-the-clock" work, the sole claim asserted in Plaintiff's Complaint. (App. 078-81.)

Plaintiff's counsel first disclosed an interest in whether O'Reilly properly paid Plaintiff's commissions on December 15, 2004, in a meeting between counsel called to discuss a privilege log issue. (App. 069-70.) At the meeting, when Plaintiff's counsel raised the issue, O'Reilly's counsel immediately offered to investigate the question if Plaintiff would disclose the basis for her claim, since it had not been pleaded. *Id.* O'Reilly followed up with a letter that same day offering again to provide documentation of how Plaintiff's commissions are calculated and paid. *Id.* However, Plaintiff's counsel expressed a preference to pursue the matter formally through the lawsuit. (App. 071-72.) There was some additional correspondence but counsel were unable to work out a mutually agreeable disclosure arrangement regarding the threatened claim. (App. 073-77.) Therefore, on December 28 and 29, 2004, although no commission claim had been filed, but to avert the cost and trouble of defending against the threatened but futile claim, O'Reilly simply unilaterally turned over to Plaintiff the data now provided to the Court demonstrating its compliance with 29 C.F.R. 778.120. (App. 078-81.)

19

Subsequently, in a January 20 telephone conference with Plaintiff's counsel to address discovery issues generally, Plaintiff's counsel expressed concern that the data provided in December were from October 2004, a date *after* Plaintiff's lawsuit had been filed. Plaintiff's counsel questioned whether the formulas might have been made compliant for the first time in October 2004 *because* the suit had been filed. To assuage Plaintiff's counsel's concern, O'Reilly's counsel followed up by letter dated January 21, 2005. (App. 082-84.) That letter confirmed, among other things, that the formulas for calculating commissions and overtime on commissions that were provided to Plaintiff's counsel in December 2004, drawn from examples in October 2004, had been in place at least "at least for the three years preceding Ms. Salinas' filing of her lawsuit." (*Id.* at 083.) Until filing her present brief, Plaintiff has never indicated -- in her Complaint, through initial disclosures, or in prior briefing to this Court -- that she would assert a collective action over this futile, unpleaded allegation.

## IV.   DISCUSSION OF AUTHORITIES

### A.   The Collective Action Conditional Certification Standard

The Fair Labor Standards Act ("FLSA") permits a plaintiff to maintain an action on "behalf of himself . . . and others similarly situated." 29 U.S.C. § 216(b) (2000). District courts have the discretion, in appropriate cases, to implement § 216(b) in FLSA actions by regulating the notice, if any, sent to similarly-situated potential plaintiffs. *See Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 169-70 (1989). However, such court-facilitated notice is authorized *only* after the plaintiff has made a sufficient showing that a similarly-situated class exists. *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995). Although a court need not reach a conclusive determination with respect to whether a class of similarly-situated plaintiffs exists at this stage, there must be, *at a minimum*, evidence of such a potential class sufficiently developed at this time to allow court-facilitated notice. *See H&R Block Ltd. v.*

*Housden,* 186 F.R.D. 399, 400 (E.D. Tex. 1999). Salinas therefore must submit competent

evidence, not merely make unsupported allegations, that a group of similarly-situated plaintiffs

exists to proceed with her collective action claims. *Id.* In light of Plaintiff's deposition

testimony, she cannot make this showing. The evidence—Plaintiff's own testimony—weighs

convincingly against any "nexus" between Plaintiff and the nation-wide putative class of hourly-

paid retail store employees she seeks to represent. Plaintiff herself testified that her alleged

troubles relate to only a single O'Reilly store and a single O'Reilly manager.

**B.     The "Similarly Situated" Standard Urged by Plaintiff Contradicts the Controlling
        Standard Used by Courts Within the Fifth Circuit.**

          The "similarly situated" standard urged by Plaintiff directly contradicts the

standard used by courts within the Fifth Circuit. Plaintiff cites *Grayson v. K Mart Corp.*, 79 F.3d

1086, 1096 (11th Cir. 1996), for the proposition that the existence of a "'unified policy, plan or

scheme'" is "not required to satisfy the more liberal 'similarly situated' requirement of §

216(b)." (Pl.'s Brief at 7 (emphasis in original).)    Courts within the Fifth Circuit, however,

require a plaintiff to establish that the putative collective action members "were together the

victims of a single decision, policy, or plan" that violates the FLSA. *See, e.g., Mooney v.*

*Aramco Servs. Co.*, 54 F.3d 1207, 1214 n.8 (5th Cir. 1995); *Aguilar v. Complete Landsculpture,*

*Inc.*, No. Civ. A. 3:04 CV 0776 D, 2004 WL 2293842, at *2 (N.D. Tex. Oct. 7, 2004) (App. 085-

90); *Villatoro v. Kim Son Rest., L.P.*, 286 F. Supp. 2d 807, 810 (S.D. Tex. 2003); *H&R Block,*

*Ltd. v. Housden*, 186 F.R.D. 399, 400 (E.D. Tex. 1999); *Camp v. Lockheed Martin Corp.*, No.

H-97-1938, 1998 WL 906915, at *2 (S.D. Tex. Apr. 23, 1998) (App. 091-94). Indeed, several of

the Eleventh Circuit cases cited in Plaintiff's Brief expressly recognize the disparity between the

"similarly situated" standards used by the Fifth and Eleventh Circuits. *See Marsh v. Butler*

*County Sch. Sys.*, 242 F. Supp. 2d 1086, 1092-93 (M.D. Ala. 2003); *Barron v. Henry County Sch. Sys.*, 242 F. Supp. 2d 1096, 1103 (M.D. Ala. 2003).

Plaintiff also misstates her burden of establishing that she is "similarly situated" to others, even in the Eleventh Circuit. Quoting *Hipp v. Liberty National Life Insurance Co.*, 252 F.3d 1208 (11th Cir. 2001), Plaintiff states that "Plaintiff's burden, 'which is not heavy, [may be met] by making substantial allegations of class-wide discrimination" which 'successfully engage defendants' affidavits to the contrary.'" (Pl.'s Brief at 9 (alteration in original).) Plaintiff omits, however, the portion of this quote indicating that "substantial allegations" in fact means "detailed allegations supported by affidavits." *Hipp*, 252 F.3d at 1218-19.[20]   Courts within the Fifth Circuit likewise require a plaintiff to show by "the pleadings and any affidavits which have been submitted" that she is "similarly situated" to the putative collective action members. *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995); *Villatoro v. Kim Son Rest., L.P.*, 286 F. Supp. 2d 807, 809 (S.D. Tex. 2003).

Notwithstanding the March 10 hearing which gave rise to this briefing, Plaintiff apparently still seeks a class of all hourly-paid, retail store employees at O'Reilly, corporate-

---

[20] Nor do the facts of *Hipp v. Liberty National Life Insurance Co.*, 252 F.3d 1208, 1214-15 (11th Cir. 2001), cited by Plaintiff, support an argument for conditional certification of a collective action here. In *Hipp*, former employees of the defendant employer brought suit under the ADEA, alleging that the defendant engaged in a pattern and practice of age discrimination resulting in the plaintiffs' constructive discharge. 252 F.3d at 1214-15. The district court allowed notice and certified a class consisting of "[a]ll persons who are, or were, employed by [defendant] on or after August 25, 1993, who are, or were, managerial employees, district managers or above, residing in the United States, who were over 40 years of age." *Id.* at 1215. The defendant then filed motions for summary judgment as to the claims of several Plaintiffs, which were substantially denied. *Id.* The claims of ten plaintiffs were subsequently tried to a jury, which found that the defendant had engaged in a pattern and practice of age discrimination and awarded seven of the ten plaintiffs damages. *Id.* The defendant appealed on several grounds, including that the district court erred in certifying the case as a collective action. *Id.* at 1216. Although the Eleventh Circuit affirmed the district court's certification of the case as a collective action, the Court explained that it preferred the two-step certification procedure that was outlined in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 353-54 (D.N.J. 1987) and which the district court declined to apply. *Id.* at 1219. Indeed, the Eleventh Circuit agreed with the defendant and explained that had the district court utilized this preferred procedure, it would have been prudent for the district court to decertify the class upon the defendant's motion. *Id.* Given the discretion vested in the district court and the flexibility of the "similarly situated" standard, in that event, however, the Court could not find an abuse of discretion in its certification of the class. *Id.*

wide. Here, Plaintiff's own claims and her clear testimony establish that no reasonable basis exists to conclude that the nationwide putative collective action class she articulates is "similarly situated." Plaintiff is not entitled, therefore, to pursue the names and addresses of thousands of O'Reilly employees or former employees in the instant case. *See H&R Block*, 186 F.R.D. at 400-01.

Plaintiff must present substantial evidence that O'Reilly implemented a single decision, policy or plan that was intended to violate the FLSA by depriving Plaintiffs of overtime compensation. *Id.* at 400. She is foreclosed from doing so by her own testimony. She is foreclosed from doing so by the futility of her new commission allegation. She is foreclosed from doing so because her new "store closing duties" allegation is foreclosed by her testimony. And she is foreclosed from doing so because her attorney has, and has had, the names and addresses of those to whom she contends Ronnie Everage also failed to pay overtime, yet she still offers no evidence of a nexus among such claims—even for opt-in Donna Seay, who worked with her.

**C.    Plaintiff's Authorities Do Not Support that She May Discover Names and Addresses of Putative Class Members before Establishing a "Similarly Situated" Nexus.**

Plaintiff argues that she is entitled to conduct discovery essentially to find out whether her allegation that she is "similarly situated" to the other putative collective action class members will permit her to obtain court-authorized notice. (Pl.'s Brief at 3.) The cases Plaintiff cites for this proposition, however, limit the scope of permitted discovery to the names and addresses of individuals who *already* are determined to be "similarly situated" to the representative plaintiff. As such, the cases Plaintiff relies upon necessarily require that the Court first determine whether the representative (named) plaintiff and the putative collective action members are "similarly situated," as that standard is defined in the court's particular

circuit, *before* permitting discovery so that the court can determine whether discovery is in fact appropriate and what the proper scope of such discovery should be.

In *Tucker v. Labor Leasing, Inc.*, the plaintiffs sought the "names of all employees of the defendants who are not exempt pursuant to the terms of the Fair Labor Standards Act" and the "names and addresses of employees of the defendants who were due overtime compensation but did not receive it." The purpose of the name and addresses sought was solely to facilitate court-authorized notice. 155 F.R.D. 687, 689 (M.D. Fla. 1994). Holding the scope of the request too broad, the Florida district court, using the broad "similarly situated" standard employed by the Eleventh Circuit, noted that "only those employees who are 'similarly situated' with respect to their job requirements and with regard to their pay provisions to the Plaintiffs may properly be notified of this action and their right to 'opt-in.'" *Id.* The court then permitted discovery of names and addresses only as to "individuals employed as rater, biller, or non-management office staff. Whether 'non-office management staff' are similarly situated to the current Plaintiffs in their job duties will be further addresses at the hearing on Plaintiffs' Motion to Approve Notice to Potential Class Members." *Id. Tucker* clearly does not support Plaintiff's position that a collective action plaintiff may discover names and addresses of the putative class members without first demonstrating a similarly situated status and certainly not for purposes other than notice.

Similarly, in *Miklos v. Golman-Hayden Co.*, the plaintiff sought discovery of the names and addresses of putative collective action members. No. CIV. A. 2:99-CV-1279, 2000 WL 1617969, at *2 (S.D. Ohio Oct. 24, 2000) (App. 095-96). The Ohio district court explained that "[t]he opt-in provision of the FLSA requires some procedure for identifying and notifying the potential class members. The *first step*, of course, is to identify those employees who may be

similarly situated and who may therefore ultimately seek to opt into the action." *Id.* (emphasis added). The court then defined "similarly situated" to mean "employees whose causes of action under the FLSA accrued at about the time and place in the approximate manner of the named plaintiff," which under the facts of that case included others employed as logistics coordinators by the defendant during the same time period. *Id*. at *1-2. Once again, the "similarly situated" filter, applied to the facts of the case, controlled which names and addresses should be provided for purposes of "notifying the potential class members." *Id.* at *2.

Thus, as the cases cited by Plaintiff clearly indicate, Plaintiff is entitled to discover only the names and addresses of potential class members to whom she is "similarly situated." Plaintiff *first* must establish that she is "similarly situated" to others for the court to determine whether discovery of the names and addresses of potential class members is appropriate and to properly limit the scope of such discovery.

Under the controlling "similarly situated" standard used in the Fifth Circuit, courts require not only that the named plaintiff and the putative collective action members be similarly situated with respect to job requirements and pay provisions, *see Aguilar v. Complete Landsculpture, Inc.*, No. Civ. A. 3:04 CV 0776 D, 2004 WL 2293842, at *2 (N.D. Tex. Oct. 7, 2004); *Barnett v. Countrywide Credit Indus., Inc.*, No. Civ. A.3:01-CV-1182-M, 2002 WL 1023161, at *1 (N.D. Tex. May 21, 2002) (App. 097-98), but also that there be some "factual nexus" which binds the named plaintiff and the putative class members together as victims of a "single decision, policy, or plan" that violates the FLSA. *See, e.g., Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1214 n.8 (5th Cir. 1995); *Aguilar v. Complete Landsculpture, Inc.*, No. Civ. A. 3:04 CV 0776 D, 2004 WL 2293842, at *2 (N.D. Tex. Oct. 7, 2004); *Villatoro v. Kim Son Rest., L.P.*, 286 F. Supp. 2d 807, 810 (S.D. Tex. 2003); *H&R Block* 186 F.R.D. at 400; *Camp v.*

*Lockheed Martin Corp.*, No. H-97-1938, 1998 WL 906915, at *2 (S.D. Tex. Apr. 23, 1998).

Thus, assuming that discovery is appropriate, the scope of such discovery would have to be

limited to the names and addresses of those individuals who shared similar job requirements

and pay provisions with Plaintiff *and* who were subject to the same specific policy, decision, or plan

that Plaintiff alleges violates the FLSA. Indeed, Plaintiff necessarily must first identify this

"single decision, policy, or plan" that she claims violates the FLSA and of which she and the

putative collective action members allegedly are victims. Here, there is none. Ronnie Everage is

the cause of Plaintiff's alleged troubles.

Plaintiff also cites *Bailey v. Ameriquest Mortgage Co.* to say that the United

States Supreme Court in *Hoffman-La Roche, Inc. v. Sperling* "recognized that discovery of the

identities of potential class members is appropriate <u>before</u> a 'similarly situated' analysis is

invoked." (Pl.'s Brief at 4-5 (emphasis in original).) Plaintiff is mistaken. The Court in

*Sperling* expressly limited its holding to the conclusion that "district courts have discretion, in

appropriate cases, to implement 29 U.S.C. § 216(b) . . . by facilitating notice to potential

plaintiffs." 493 U.S. 165, 169 (1989). Indeed, the Court reiterated that it was only "confirm[ing]

the existence of the trial court's discretion, not the details of its exercise." *Id.* at 170. The Court

therefore expressly did not address the timing of the "similarly situated" analysis with respect to

the discovery of the names and addresses of putative collective action members.

Furthermore, the facts of *Sperling* reflect that the district court did engage in a

"similarly situated" analysis before permitting discovery of the names and addresses of the

putative class members. In *Sperling*, the defendant employer ordered a reduction in work force

and discharged or demoted approximately 1200 employees. 493 U.S. at 168. A group of such

employees subsequently brought suit against the employer under the Age Discrimination in

Employment Act. *Id.* When plaintiffs moved for discovery of "the names and addresses of all similarly situated employees, the district court required that the employer produce the names and addresses of the *discharged employees, i.e.,* persons who, together, clearly were affected by a single policy, practice or decision of the employer. The Fifth Circuit's seminal case, *Mooney,* falls squarely within the boundaries of *Sperling. Id.*

Plaintiff also cites *Weaver v. Wal-Mart Stores, Inc.,* Civ. Action No. 2-02-CV-220 (TJW) (E.D. Tex. Aug. 23, 2004) to support the claim that plaintiffs are entitled to discovery to satisfy their burden under *Lusardi*'s "notice" stage. (App. to Pl.'s Brief at 10-21.) The *Weaver* facts, however, are determinative of the outcome of that case and distinguishable from this case. In *Weaver,* the plaintiffs made very specific allegations about the scope of their collective action, which the court used to narrow the scope of the discovery that it permitted before the "notice" stage. Specifically, the plaintiffs alleged that the class consisted of employees of the defendant who had been employed in the same position as Loss Prevention Associates ("LPAs"). *Id.* at *1. The plaintiffs also "allege[d] that there was a common understanding and employment practice that was communicated to the LPAs during their on-the-job training and passed down to the next trainees." *Id.* at *9.

The district court permitted the plaintiffs to engage in discovery before the "notice" stage, but specifically limited the scope of such discovery to facts involving only Loss Prevention Associates who had been employed by the defendant in the Eastern District of Texas and the State of Arkansas. *Id.* at *2. Furthermore, the discovery permitted by the district court before the "notice" stage did not include the names and addresses of the putative collective action members. *Id.* at *2-3. Indeed, the court did not authorize the plaintiffs to obtain that information until *after* the court had determined which putative collective action members were

"similarly situated" to the named plaintiffs. *Id.* at *10-12. The court explained that "although the Court finds that the Plaintiffs have sustained their burden of showing a common employment practice or policy, the Court is not convinced that notice should be sent out nationwide. In this case, as the allegations center around the creation of an environment by the local supervisors and managers whereby there is an understanding that the LPAs have to do some overtime work off the clock, the Court finds that the evidence only supports conditional certification of a class of LPAs in [the Eastern District of Texas and the State of Arkansas.]" *Id.* at *10.

## V. **CONCLUSION**

O'Reilly respectfully requests that the Court deny Plaintiff the names and addresses of the "subset" of thousands of O'Reilly employees and former employees Plaintiff now seeks. The opportunity presented by the Court's March 11 Order to acknowledge the limits of Plaintiff's role as a representative plaintiff, in light of her testimony, was not well met. On the contrary, rather than a narrowing of the claims and the proposed putative class in acknowledgement of the limits to Plaintiff's actual claims, Plaintiff briefed new claims outside the scope of her pleadings (overtime on commissions) and her prior testimony (unpaid store-closing duties). She continues to seek the names and addresses of a far-flung putative class (described by her as subset of the true, but broader putative class) -- not for purposes of notice, but for the purpose of contacting such individuals to find out whether Plaintiff can get evidence to support issuance of notice to the broader putative collective action class. No court, not even in the decisions cited by Plaintiff, supports this approach to discovery, and it falls far afield of the guideposts provided by *Mooney*.

Plaintiff has had nine months to move to conditionally certify a collective action, and the burden to do so, when properly met, is not harsh. Plaintiff has her own claims, well-defined by her testimony. She has the addresses of those whom she maintains also were not paid

by Everage, such as Clay, Trainowski, Seay, Malefant and others. She has O'Reilly's corporate policies and directives. She has her own personnel and payroll files and those of each of the seven opt-ins in the case, including Seay, her former co-worker under Ronnie Everage. She has the benefit of her counsel's numerous contacts with O'Reilly employees across the country, who apparently have similar stories. She has the benefit of her own self-help, the contacts that resulted from the press releases Plaintiff issued in August 2004. Finally, apart from the names and addresses of the thousands of employees and former employees who would fit the class of the "subset" of individuals set out in Plaintiff's Brief at 9, Plaintiff has not identified any other discovery that she contends is necessary before she should move to conditionally certify.

It is time to stop fishing and cut bait. Plaintiff should file her motion for conditional certification, or not. No further discovery is necessary.

Respectfully submitted,

BAKER BOTTS L.L.P.

By: _____

OF COUNSEL:

Eric Senske
State Bar No. 18027100
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX 75201
(214) 753.6500 (Telephone)
(214) 753.6503 (Fax)

Teresa S. Valderrama
State Bar No. 20422500
Kathryn S. Vaughn
State Bar No. 00785144
One Shell Plaza
910 Louisiana
Houston, Texas 77002
Telephone: (713) 229-1234
Facsimile: (713) 229-1522

LUTTRELL & WILLIAMS, P.C.

John M. Williams
State Bar No. 21554200
L. Don Luttrell
State Bar No. 12708630
3000 Weslayan, Suite 350
Houston, Texas 77027
Telephone: (713) 877-1077
Facsimile: (713) 877-1089

ATTORNEYS FOR DEFENDANT
O'REILLY AUTOMOTIVE, INC.

## CERTIFICATE OF SERVICE

This document was electronically filed on April 20, 2005. Service is made electronically under the ECF procedures.

Teresa Valderrama