UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ANNA SALINAS, on her behalf and on behalf of those similarly situated, § § § Plaintiff, § § v. § § O'REILLY AUTOMOTIVE, INC., § § Defendant. § | § § § § § § CIVIL ACTION NO. 3: 04-CV-1861-B § § § § |

## MEMORANDUM ORDER

Before the Court is Plaintiff's Motion for Notice to Potential Class Members ("Motion for Notice") (doc. 126), filed June 23, 2005.[1] The Court DENIES the motion for the reasons that follow.

### I. Factual and Procedural Background

On August 26, 2004, Plaintiff Anna Salinas ("Salinas") filed this action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, on behalf of herself and others similarly situated. Salinas was employed by Defendant O'Reilly Automotive, Inc. ("O'Reilly") from December 1999 until May 2004. (Compl. ¶ 11). Seven other current and/or former O'Reilly employees have filed consents to join as plaintiffs in this case. Though the allegations in her original complaint were extremely vague, Salinas has now defined the class she seeks to certify to include hourly, nonexempt retail store employees who spent time performing tasks after store closing hours without receiving proper pay. Salinas says that these "closing duty workers" were either paid for only a portion of time

---

[1] Briefing relative to the Motion for Notice was complete as of August 29, 2005.

1

spent performing such duties, or they were not paid at all.

The Court held a hearing on March 10, 2005 dealing with various outstanding motions filed by the parties. Among other things, the Court heard argument regarding whether Salinas was entitled to discover the names and addresses of similarly situated current and/or former O'Reilly employees. The following day the Court ordered O'Reilly to provide Salinas with the names and addresses of O'Reilly employees that were similarly situated to Salinas. The Court directed the parties to confer in an attempt to reach agreement on how "similarly situated" individuals should be defined. Agreement could not be reached, however, and the parties submitted briefing on the scope of the names and addresses to be produced by O'Reilly.

Upon review of the parties' briefing, the Court determined that O'Reilly should not be made to produce to Salinas the names and addresses of similarly situated individuals until such time as the Court had made the initial determination of whether this case should be conditionally certified as a collective action under the FLSA, with notice to issue to potential class members. The Court established a briefing schedule with respect to Plaintiff's Motion for Notice. The parties have filed motion papers in accordance with that schedule, and the issues presented by those papers are ripe for review and determination by the Court.

## II. Analysis

### A.   *General Standards*

Employers are required under the FLSA to compensate non-exempt employees at overtime rates for time worked over a statutorily-defined number of hours. 29 U.S.C. § 207(a). "[A]ny one or more employees" may bring an FLSA action on behalf of herself or themselves and other "similarly situated" employees. 29 U.S.C. § 216(b). A collective action under the FLSA is designed to serve

the dual purposes of vindicating FLSA rights while conserving judicial resources. *See Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709, at *3 (E.D. La. July 2, 2004) (citing *Hoffman-LaRoche Inc. v. Sperling*, 439 U.S. 165, 170 (1989)). Whether to conditionally certify an action to proceed collectively and allow a plaintiff to notify potential plaintiffs of their right to "opt-in" the suit is a discretionary matter for the district court. *See Sperling*, 439 U.S. at 170.

While the Fifth Circuit, in *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1216 (5th Cir. 1995), declined to adopt any particular methodology for "opt-in" certification under the Age Discrimination in Employment Act ("ADEA"), which explicitly incorporates § 216(b) of the FLSA, the majority of federal courts employ the approach developed in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D. N.J. 1987). *See e.g. Butler v. San Antonio*, 2003 WL 22097250, *1 (W.D. Tex. Aug. 1, 2003); *Villatoro v. Kim Son Rest.*, 286 F. Supp.2d 807, 809-10 (S.D. Tex. 2003); *Barnett v. Countrywide Credit Indus., Inc.*, 2002 WL 1023161, at *1 (N.D. Tex. May 21, 2002). Under the *Lusardi* approach, the first stage is the "notice stage" at which the court determines whether the plaintiff has provided sufficient evidence that "similarly situated" potential plaintiffs exist. *Mooney*, 54 F.3d at 1214-15. Because the court has minimal evidence at this stage, usually in the form of pleadings and affidavits, the standard for making this determination is lenient. *Id.* at 1214; *Aguilar v. Complete Landsculpture, Inc.*, 2004 WL 2293842, at *2 (N.D. Tex. Oct. 7, 2004); *Cameron-Grant v. Maxim Healthcare Serv., Inc.*, 347 F.3d 1240, 1243 (11th Cir. 2003).

The plaintiff need only demonstrate that the potential class members "are similarly situated with respect to their job requirements and with regard to their pay provisions." *Aguilar*, 2004 WL 2293842, at *1-2. The positions need not be identical. *Barnett*, 2002 WL 1023161, at *1. Nothing more is required than "substantial allegations that the putative class members were together victims

of a single decision, policy, or plan infected by discrimination." *Mooney*, 54 F.3d at 1214 n.8 (internal quotations and citations omitted); *Villatoro*, 286 F.Supp. 2d at 810. If the plaintiff satisfies the relaxed "notice stage" standard, then the court will usually conditionally certify the class. *Id.*; *Hall v. Burk*, 2002 WL 413901, at *2 (N.D. Tex. March 11, 2002). After notice and time for opting-in, the action proceeds as a collective action throughout discovery. *Mooney*, 54 F.3d at 1213-14.

The "second stage" is typically precipitated upon a motion for "decertification" filed by the defendant. *Id.* at 1214. The court may then re-examine its decision and decertify the class. *Id.* at 1214; *Hall*, 2002 WL 413901, at *2. The court's decision on whether the class members are similarly situated is then based upon the factual information gleaned from discovery. *Johnson v. TGF Precision Haircutters, Inc.*, 319 F.Supp.2d 753, 754-755 (S.D. Tex. 2004).

**B.**     *Whether Salinas has Demonstrated the Existence of "Similarly Situated" Potential Plaintiffs*

As discussed above, the first step in determining the propriety of conditional certification is to ascertain whether Salinas has provided "minimal evidence" demonstrating that similarly situated putative "opt-in" class members exist. *Mooney*, 54 F.3d at 1213-14. Salinas bears the burden of showing that she is similarly situated to the proposed class of employees. *Basco*, 2004 WL 1497709, at *5 (citing *Pfohl v. Farmers Ins. Group*, 2004 WL 554834 (C.D. Cal. March 1, 2004)). In an attempt to meet her burden, Salinas relies upon her own deposition testimony, declarations from six other individuals who have either filed consents to join as plaintiffs in this case or who are considered to be potential opt-in plaintiffs, and various records generated from investigations of O'Reilly's labor practices by the United States Department of Labor ("DOL") dating back to 1997. Below the Court will generally describe those items of evidence.

Salinas started working for O'Reilly on December 20, 1999, and resigned on May 7, 2004. (App. in Supp. Pl.'s Mot. for Notice ["Pl.'s App."] at 2, 3). During her near 4 1/2 year tenure at O'Reilly, Salinas had worked at at least six different O'Reilly store locations and has assisted in setting up inventory at several others. (App. in Supp. Def.'s Resp. ["Def.'s Resp. App."] at 8-11). While Salinas worked under the supervision of several different managers during this time, her sole complaint in this lawsuit is with Ronnie Everage, the manager of O'Reilly's Mansfield, Texas store. (*Id.* at 15, 26). Salinas claims that from January 2004 to April 2004, she was not paid for time spent running the end-of-the-month backup tapes after the store closed at 9:00 p.m. (*Id.* at 18, 24). She ran the backup tapes approximately six times over these four months without being paid overtime. (*Id.*). Performing this duty took anywhere between 30 minutes and two hours. (*Id.* at 17-18).

Salinas and other employees at the Mansfield store would typically record extra time worked on the schedule. (*Id.* at 20-21). Salinas contends that she was unable to record the extra time she worked running the backup tapes, however, because Everage moved the schedule into his office on a spot over his desk that was so high that nobody could reach it. (*Id.* at 20). Salinas claims that Everage instructed her not to write on the schedule. (*Id.*).

Declarant Lionel Flores was an associate manager at an O'Reilly store in Houston, Texas. (Pl.'s App. at 42). He claims that his two managers told him that O'Reilly would only pay for work performed after the store had closed up until a set time, varying from 30 to 60 minutes past closing. (*Id.* at 43). Any time worked beyond that, Flores says, was uncompensated. (*Id.*). He further states that he "frequently" ran end-of-the-day sales printouts beyond the time for which he was paid had expired. (*Id.* at 44). Flores also reports that O'Reilly counterpersons who closed the store with him were not paid for after-hours work beyond a specified period of time. (*Id.* at 44).

Declarant Patrick Gruesbeck was a night manager for O'Reilly from January 2001 through June 2001. (*Id*. at 46). He states that during his short tenure with the company he was scheduled to work five to six days per week from 12:30 p.m. to 9:30 p.m, but that approximately two days per week he worked 15 to 45 minutes past his scheduled time, for which he was not paid. (*Id*. at 46-47). Tasks which Gruesbeck performed after 9:30 p.m. included counting the cash register drawers and running end-of-the-night reports. (*Id*. at 47). He "believes" that other employees working past 9:30 p.m. were similarly not paid for all the time they worked because "it was O'Reilly's policy that employees were not paid for work past the time they were scheduled to stop working, even if they actually worked past that time." (*Id*.).

Declarant Dusty Green, who has not filed a consent to join this suit, was a night manager at an O'Reilly store in Alabama. (*Id*. at 49). He states that while he was "occasionally" paid overtime, he worked "numerous" hours for the company without receiving compensation for those hours. (*Id*.). Green would typically work 30 to 45 minutes running reports and counting money after the store had closed. (*Id*. at 50). He was not paid for all of this time worked, however, because "[i]t was O'Reilly's unwritten policy that I would not be paid for the time that I worked after the store closed." (*Id*.).

Declarant Mary Katherina Woodard, also of Alabama, was an assistant manager at an O'Reilly store from May 2002 through November 2004. (*Id*. at 51). She too was "occasionally" paid "some overtime", but states that she "was never paid more than 5 hours overtime per week when Todd [last name unknown] and [Jesse] Loveless were the managers." (*Id.* at 52). Woodard states that she would count cash registers, run end-of-the-night and end-of-the-month reports without always receiving pay for performing such activities. (*Id.* at 51-52). Woodard further states that in October 2004 she attended a training session where several assistant managers and managers in

stores operating under the jurisdiction of Eric Simms, the district manager, told the trainer that they were not being paid for time worked after store closing hours. (*Id.* at 53).

Declarant and opt-in plaintiff Jay O'Neal worked at two different O'Reilly stores in Oklahoma from February 1999 to May 2002. (*Id.* at 56). During his tenure at O'Reilly, O'Neal states that he worked as an assistant manager, a night manager, and a dealer. (*Id.*). He claims that as an assistant manager and dealer he regularly worked 50 hours a week, but was paid time and a half for only five of the 10 hours he worked above 40 hours. (*Id.* ). As night manager[2], O'Neal claims that he regularly worked 50 or more hours a week but was not paid time and a half for any time worked over 40 hours a week. (*Id.* at 56-57).

Finally, declarant Scott List worked at two different stores in Garland, Texas as an installer service specialist. (*Id.* at 58). He claims that he was told by several employees at one of those stores that such employees were not paid for 15 to 30 minutes of work performed after midnight. (*Id.* at 59). He further states that he was told by employees at the other store at which he worked that such employees were not paid for 15 to 30 minutes of work performed after 10:00 p.m. (*Id.*). Notably, List does not state that he himself performed any store closing duties for which he did not receive compensation. His knowledge of O'Reilly's alleged FLSA violations stems solely from what he was told by his co-workers.

Salinas also cites to four different DOL investigations of O'Reilly that took place from 1997 to 2004. The first investigation concluded that an O'Reilly store in Oklahoma failed to compensate

---

[2] O'Reilly contends that O'Neal was never a night manager. (Def.'s Resp. Brief at 10). O'Reilly claims instead that O'Neal was hired as a parts specialist and later became an assistant manager and then an installer service specialist, or "dealer." (Def.'s Resp. App. at 54-55). According to O'Reilly, an installer service specialist does not typically perform closing duties. (*Id.* at 54).

employees for all overtime hours worked. (Pl.'s App. at 66). The report noted that the manager of the store recorded employees' hours on a calendar in his office, recommending that "perhaps a more permanent and reliable method of [recordkeeping] would be more dependable." (*Id.*). The report did not indicate any violations concerning closing duties performed by O'Reilly employees.

The second investigation found a recordkeeping violation in a Nebraska store for failing to maintain appropriate records of employee hours worked. (*Id.* at 73). Some employees also reported that they averaged around 40 hours a week but were able to take time off the next day to average 40 hours a week "if they worked a little late some evenings." (*Id.*). Again, this report did not specifically indicate any violations concerning closing duties performed by O'Reilly employees.

The third investigation concerning a Missouri store location involved complaints that "on a limited basis some of the [employees] would [work] beyond their scheduled shift when they closed the store." (*Id.* at 81). In such cases the employee would tell the store manager, who would adjust the employee's schedule to prevent the employee from exceeding 40 hours of work per week. (*Id.*). Adjustments were typically effected by allowing employees to come into work late the following day. (*Id.*). The report also noted a failure to maintain proper daily/weekly records. (*Id.*).

The final investigation found that a Missouri store had failed to compensate employees for time and a half for hours worked in excess of 40 hours per week. (*Id.* at 89). The investigation also concluded that employees were "often times [] paid for only scheduled hours disregarding postliminary time worked." (*Id.*).

Considering the foregoing evidence, the Court finds that Salinas has failed to show that she and the potential opt-in plaintiffs are similarly situated. The case of Salinas herself, the named plaintiff, is emblematic of her failure to demonstrate that the circumstances described in the evidence

she presents were created by a generally applicable policy or practice of O'Reilly. Salinas worked at at least six different O'Reilly store locations during her 4 1/2 years with the company. During that time she complains that she was not paid all the overtime to which she was entitled at just one of those stores, in Mansfield, Texas, and that even there she complains only about the actions of one particular manager, Ronnie Everage. In fact, Salinas recounted at her deposition that many of the other store managers for whom she worked were "good" managers who paid her the proper amount of overtime.

Thus, with respect to "closing duties", Salinas's sole complaint seems to be that she worked beyond her scheduled hours without pay on approximately six occasions between January 2004 and April 2004. She claims that she was unable to record the extra hours worked because Everage, the store manager, placed the hours schedule in his office beyond her reach and instructed her not to write on it. Salinas's own testimony thus shows that her claims are limited to the misdeeds of a single manager at a single O'Reilly store. The conduct of which Salinas complains scarcely evidences a widespread policy or practice. *See Basco*, 2004 WL 1497709, at * 6 (concluding that plaintiffs' "extremely anecdotal" testimony concerning one manager was insufficient evidence of a policy or practice).

O'Reilly also contends that the experiences of opt-in plaintiffs Gruesbeck, O'Neal, Flores, and List, and potential plaintiffs Green and Woodard, further demonstrates that the complained of FLSA violations are local in nature and based on manager-specific conduct. O'Reilly points out the differences in the alleged "policies" effected by various O'Reilly managers spread across parts of Texas, Oklahoma, and Missouri. Some declarants, for example, generally claim that their managers failed to pay *any* overtime for closing duties performed beyond scheduled working hours (Gruesbeck).

Others allege that their managers had a policy to pay up to only five or 10 hours of overtime per week (Woodward and O'Neal). Still others complain that their managers paid overtime only up to a "set time" – usually 30 to 60 minutes – after closing (Flores), or that managers would only "occasionally" pay overtime (Green, Woodard). And of course, though Salinas admits that the majority of managers for whom she worked were "good managers" that paid her the proper amount of overtime, she complains that one manager, on approximately six occasions over a four-month span, prevented her from recording her overtime for running monthly backup tapes by placing the schedule out of her reach.

Salinas's evidence fails to convince the Court that the violations of which she is complaining are indicative of a company-wide policy or practice. *See H&R Block, Ltd. v. Housden*, 186 F.R.D. 399, 400 (E.D. Tex. 1999) (denying motion for approval of notice, finding that, among other things, plaintiffs failed to submit evidence "that might show a widespread plan of discrimination existed."). O'Reilly is a large, national corporation employing some 19,000 people in over 1286 stores in 25 different states. (Def.'s Resp. App. at 53). Salinas's evidence, taken as true, merely shows that a handful of O'Reilly managers have committed possible FLSA violations in a variety of different ways. The fact that many of the claims happen to involve a failure to pay overtime for duties performed after closing hours is alone insufficient to show that Salinas and potential class members are bound together as victims of an O'Reilly policy or practice. As these claims are flavored by particularized conduct occurring at the store/manager level, they should appropriately be tried separately. The Court finds that forcing these claims, which each involve their own unique facts and circumstances, into a collective action would disserve the interest of judicial economy. Having found that Salinas has failed to meet her burden to demonstrate substantial similarity, the Court denies Plaintiff's

Motion for Notice and finds that there is no basis to conditionally certify a class in this case.

The Court finds support for the decision it reaches today from various district court cases within this circuit. In *Basco v. Wal-Mart Stores Inc.*, 2004 WL 1497709 (E.D. La. July 2, 2004), for example, the plaintiffs alleged that Wal-Mart engaged in a "pattern" of conduct whereby its employees worked off the clock, were locked in the store at night off the clock while waiting for management to release them, and were forced to miss rest and meal breaks. *Id.* at *2. The plaintiffs moved for FLSA class certification and for approval of notice to all similarly situated employees in Louisiana. *Id.* at *1. Because the parties had engaged in substantial discovery, the court addressed both of the *Lusardi* steps in deciding whether to certify a class. *Id.* at *4. In examining the first step – whether the plaintiffs had demonstrated "some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged [policy or practice]" – the court addressed the plaintiffs' contention that they were "often" required to work off the clock. *Id.* at *5-6. The court reviewed the deposition testimony provided by the plaintiffs, and, in the court's words, was not "overwhelmed" that this testimony constituted evidence of a policy or practice. *Id.* Instead the court found the testimony "to be extremely anecdotal – one manager requiring it as oppose[d] to all, perhaps once or twice during the course of a plaintiff's work." *Id.*

The plaintiffs in *Basco* also argued that Wal-Mart's policy to keep salary costs down created an incentive for managers to have employees work off the clock. *Id.* at *6-7. But the court agreed with Wal-Mart's position that plaintiffs' request for class certification should be denied because the plaintiffs failed to identify a "single decision, policy or plan" as set forth in *Mooney*. *Id.* at *7. The court stated:

> Simply put, plaintiffs seek to make a corporate policy to keep employee wage costs low

> sufficient proof to justify the creation of a class of all Wal-Mart employees that have not been properly paid overtime in the last three years. It is obvious from the discovery presented that this "policy" and its effects are neither homogeneous nor lend themselves to collective inquiry. The effects of the policy as alleged are anecdotal, that is to say particularized. Plaintiffs' own witnesses demonstrate that the "policy" was not even uniformly or systematically implemented at any given store. While it is true that this "lesser" standard should not preclude certification, and "similarly situated" does not mean identically situated, plaintiffs have failed in their burden of proof to demonstrate identifiable facts or legal nexus that binds the claims so that hearing the cases together promotes judicial efficiency. For this reason the Court would deny the Motion to Certify Collective Action.

*Id.* at *7. So too here, while Salinas and other declarants allege a "policy", the effects of that "policy" appear to have been felt only sporadically, and, as Salinas's own situation demonstrates, the urged "policy" or "practice" was unevenly applied from store to store, and even from manager to manager.

In *England v. New Century Financial Corporation*, 370 F.Supp.2d 504, 506 (M.D. La. 2005), the plaintiffs – loan officers who performed the same job, with the same job title, and who were subject to the same compensation plan, policies, procedures and performance standards – claimed that managers at 70 of the 80 branch offices of the defendants instructed them to not record their overtime hours. *Id.* at 506. The plaintiffs having failed to file a formal motion to certify the case as a collective action, the defendants took the preemptive step of filing a motion to reject conditional certification. (*Id.* at 506). The court granted the motion, finding that the

> plaintiffs in this case have not met their burden of showing that they are "similarly situated." It is clear that this case involves a multitude of different managers at different geographical locations across the country. It is also clear that individual inquiries must predominate in this case because of the different locations, managers, and factual situations involved at each location. . . . The Court also finds that if liability is found at one location, this would not necessarily require this Court to also find liability at another location. If liability is found, damages would necessarily require a case-by-case inquiry, thereby rendering it impossible to try this case as a collective class.

*Id.* at 511. The court also found that the plaintiffs failed to provide sufficient evidence showing that the claims involved a nationwide illegal policy. The affidavits submitted by some of the plaintiffs led

the court to conclude that "that these alleged claims are based on local policies of various managers located at different sites. There is simply no evidence of a national policy that would support a collective action under the facts of this case." *Id*.

Salinas argues that reliance upon the *Basco* and *England* decisions is misplaced because she says that substantial class discovery had taken place in those cases and that the courts' decisions in those cases were "explicitly based on second stage factors applicable to decertification motions after extensive discovery." (Pl.'s Reply Brief at 9). The Court disagrees with Salinas's characterization of these decisions. Although *England* involved a rather convoluted procedural background, the opinion itself does not indicate that "extensive" class discovery had been completed.[3] For example, the court noted that defendants took the position certain discovery should only be available *after* the class has been conditionally certified – essentially mirroring O'Reilly's position throughout this lawsuit that class-related discovery is inappropriate prior to conditional certification. *Id*. at 507. The opinion also notes that plaintiffs' counsel *contemplated* taking 200-400 depositions without indicating whether any depositions were actually taken. *Id*. at 506. Furthermore, in making the "similarly situated" determination, it appears that the court relied only upon affidavits submitted by some of the plaintiffs, which would have been available even in the absence of "extensive" discovery. *Id.* at 511.

---

[3] Salinas contends that the *England* decision was issued a year and a half after the defendant was "ordered to disclose a list of all the allegedly similarly situated employees nationwide." (Pl.'s Reply Brief at 10). Salinas attaches the magistrate judge's order in their reply appendix, which states only that defendants were required to provide a "list of loan originators". (Pl.'s Reply App. at 1). It is impossible to tell from the order whether the "list of loan originators" correlated with a list of all similarly situated employees nationwide. Even assuming *arguendo* that the defendants in *England* were required to produce a list of all similarly situated employees nationwide, for the reasons stated in the Court's May 24, 2005 Memorandum Order, the Court finds that a defendant should not be *required* to furnish a plaintiff with the names and addresses of potential class members until after the class has been conditionally certified.

Nor does the Court find support in *England* for Salinas's view that the court applied "second stage" factors in reaching its decision. Rather, the court there found that the affidavits and/or declarations submitted by the plaintiffs failed to establish the existence of a nationwide policy necessary to conditionally certify a class. *Id.* The court noted that the plaintiffs themselves argued that the evidence they submitted was sufficient to satisfy the "lenient 'similarly situated' standard." *Id.* at 506. Indeed, the posture of the case at the time of decision was such that no class had yet been conditionally certified. The second stage inquiry of whether the class should be "decertified" thus did not come into play.

And while the court in *Basco* noted that "substantial discovery" had occurred in that case, it nevertheless proceeded to consider the criteria for *each* of the *Lusardi* stages. *Id.* at *5. With respect to the first stage, the court found that "plaintiffs have failed in their burden of proof to demonstrate identifiable facts or legal nexus that binds the claims so that hearing the cases together promotes judicial efficiency[]", and that "[f]or this reason the Court would deny the Motion to Certify Collective Action." *Id.* at *7. Although the *Basco* Court did note that the two steps of the inquiry tend to bleed into one another in situations where substantial evidence is presented before the court, *see id.* at *7 n.8, this Court finds that *Basco*'s treatment of the first step is persuasive authority for this case.

The Court further notes that Salinas complains about the limited scope of discovery she was permitted in this case. O'Reilly points out in its sur-reply brief that it offered Salinas the opportunity to take the depositions of ten individuals, among them being the company's Vice President of Human Resources, Director of Retail Systems, Director of Team Member Relations, and Director of Training. (Def.'s Reply Brief at 1). Salinas did not avail herself of the opportunity to depose those

14

individuals, possibly because, as Salinas contends, O'Reilly indicated that the topics on which those witnesses would testify would be limited. In any event, quarrels about the scope of discovery in this case are immaterial in light of Salinas's utter failure to demonstrate through pleadings and affidavits, over which she has control, that there is "some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged [policy or practice]." *Villatoro*, 286 F.Supp.2d at 810 (quoting *Crain v. Helmrich & Payne Int'l Drilling Co.*, 1992 WL 91946, at *2 (E.D. La. April 16, 1992)). Rather, Salinas's own evidence demonstrates that the violations of which she and others are complaining were sporadic occurrences at different stores in different states that were committed only by a select group of managers. Salinas recognizes that a court "can foreclose a plaintiff's right to proceed collectively only if 'the action relates to specific circumstances personal to the plaintiff rather than any generally applicable policy or practice.'" (Pl.'s Mot. for Notice at 9) (quoting *Crain*, 1992 WL 91946, at *2. Here, because Salinas has failed to present even minimal evidence that O'Reilly's alleged FLSA violations resulted from a "generally applicable policy or practice", the Court finds that this case should not proceed on a collective basis.

### III. Conclusion

For the reasons set forth above, Salinas's Motion for Notice is DENIED. The parties are instructed to file a joint status report regarding the status of this case within 15 days from the date of this order. The report should state whether Salinas and those who have filed consents to join in this action intend to pursue their claims on an individualized basis. The parties should further put forth their respective positions as to the scheduling of this case going forward.

SO ORDERED.

SIGNED November 17, 2005

                                                    JANE J. BOYLE
                                                    UNITED STATES DISTRICT JUDGE